NELSON ET AL. *vs.* WOODRUFF ET AL.
WOODRUFF ET AL. *vs.* NELSON ET AL.

1. A bill of lading in which the carrier acknowledges that the goods have been received by him in good order is *prima facie* evidence of that fact; but if a loss occurs, he is not precluded from showing that it proceeded from some cause which was not apparent at the time he received them.

2. When goods in the custody of a common carrier are lost or damaged, the presumption of law is that it was occasioned by his default, and the burden is upon him to prove that it arose from a cause for which he is not responsible.

3. The carrier is not responsible for leakage of a liquid occasioned by the peculiar nature of the article itself, or by secret defects which existed in the casks, but were unknown when they were shipped.

4. Nor is he answerable for diminution or leakage from barrels, though they be such as are commonly used for similar purposes, if the barrels become unfitted to hold their contents by causes connected with the nature and condition of the article which the carrier could not control.

5. Hog's lard having certain qualities which make its leakage from ordinary barrels or wooden casks unavoidable in hot weather, a person who ships it in that condition from a southern port for a long voyage, through low latitudes in midsummer, takes upon himself the risk of all loss necessarily proceeding from that cause.

6. In an admiralty suit, an objection to the deposition of a witness, on the ground of incompetency from interest, must be made at the hearing; it comes too late if it be deferred until the argument.

7. Where a deposition was taken by a person who was both commissioner and clerk of the court, and the proctor of the opposing party knew that the deposition had been taken, it cannot be ruled out on the ground that it was not sealed up, that the preliminary proof of materiality was not made, or that notice of its being filed was not. given.

These suits were brought in the District Court for the southern district of New York. They were cross-libels *in personam* on the same maritime contract, and the evidence was

identical in both cases. Nelson and his associates were the owners of the ship *Maid of Orleans*, on board of which a cargo of lard in barrels and tierces was shipped at New Orleans for New York in July, 1854, consigned to Woodruff & Co., at New York. The ship-owners demanded the freight according to the bills of lading, and the consignees claimed damages for the non-delivery of a large part of the lard, which, they alleged, was lost by leakage during the voyage. The question of law raised was, whether the contract of affreightment, under the circumstances, made the ship-owners responsible for the loss.

On the hearing in the District Court, the deposition of the master of the ship was offered by the owners and objected to by the counsel of the consignees on the ground, 1. That no preliminary proof had been made of the witness's materiality. 2. That it was not sealed up; and, 3. That no notice was given of its being filed; but the commissioner who took the deposition being the clerk of the court, and the consignees' proctor knowing that the deposition had been taken, the court (Betts, J.) overruled the objections. At the argument, another objection was taken to the same deposition that the witness was interested. The court held that it was too late; it should have been made on the hearing.

After argument and consideration of the whole evidence in both cases, the District Court dismissed the libel of the consignees, and decreed in favor of the ship-owners for the freight; and these decrees being afterwards affirmed by the Circuit Court, the consignees took appeals to the Supreme Court.

*Mr. Dean*, of New York, for the appellant, cited: Angel on Carriers, § 210; *Warden* vs. *Greer*, (6 Watts, 424;) Abbot on Shipping, 346; 1 Greenl. Ev., §§ 207, 305; *Dezell* vs. *Odell*, (3 Hill, 221;) *Welland Can. Co.* vs. *Hathaway*, (8 Wend., 483;) *Bradstreet* vs. *Herren*, (2 Blatch., 116;) *Bank of Pittsburg* vs. *Neal*, (22 How., 96;) *Goodman* vs. *Simonds*, (20 How., 363;) *Clark* vs. *Barnwell*, (12 How., 272;) *Ellis* vs. *Willard*, (5 Selden, 529.)

*Mr. Goodman*, of New York, for the appellees, cited: 3

Kent, 8th ed., 289; Angel on Carriers, §§ 211, 214; *Clark* vs. *Barnwell,* (12 Howard R., 272;) *Downe* vs. *Steam Nav. Co.,* (5 Ellis & Bain, 195;) *Trow* vs. *Vermont C. R. R. Co.,* (24 Vermont, 487;) *Hawkins* vs. *Cooper,* (8 Carr & Payne, 473;) *Button* vs. *Hudson R. R. Co.,* (18 N. Y. R., 248;) *Clark* vs. *Barnwell,* (12 How. R., 272;) 2 Boulay Paty. Droit., Commercial, 309, 313; *The Ship Martha,* (1 Olcott Ad. R., 140;) *Bradstreet* vs. *Herren,* (1 Abbot Ad. R., 209;) *Terega* vs. *Popp,* (ib., 397;) Angel on Carriers, § 211; 3 Kent, 8th ed., 289.

Mr. Justice WAYNE. We are now about to decide two appeals in admiralty from the Circuit Court U. S. of the southern district of New York.

They are substantially cross-actions, and the testimony is the same in both. They have been fully argued, and shall be discussed by us with reference to the rights and liabilities of the parties growing out of their pleadings, and the bills of lading upon which they rely.

William Nelson and others are the owners of the ship Maid of Orleans, and they have filed their libel to recover from John O. Woodruff and Robt. M. Henning, survivors of the firm of James E. Woodruff & Co., eighteen hundred and thirty-eight dollars eleven cents, with interest from the fourteenth of August, eighteen hundred and fifty-four, for the freight, with primage and average accustomed, of a large quantity of lard which was carried in their ship, in barrels and tierces, from New Orleans to New York, for which the master of the ship had affirmed for the shippers in two bills of lading; that they had been shipped in good order and condition, &c., and were to be delivered in like good order at New York, the dangers of the sea and fire only excepted, to James E. Woodruff & Co., or to their assigns, freight to be paid by him or them at the rate of $1 15 per barrel, and $1 50 per tierce, with five per cent. primage and average accustomed; and the libellants declare that the lard, upon the arrival of the ship, had been delivered to the consignees, and was accepted by them.

To this the respondents filed a joint answer, admitting the shipment, claiming that they had been made in conformity

with the bills of lading, affirming the arrival of the ship in New York, and averring that only a part of the lard had been delivered, and allege that the agents of the libellants had taken so little care in receiving the casks and tierces on board of the ship, and in the stowing and conveyance of them, and in the discharge of them at New York, that a large quantity had been lost, about sixty thousand pounds, of the value of six thousand dollars and upwards, and that the loss or diminution in its weight had not been lost by the perils of the sea, or from fire. They further answer, that, relying upon the bills of lading, the consignees, James E. Woodruff & Co., had made large advances upon them to the shippers of the lard. They then declare that, for cause stated by them, they were not liable to pay the freight and primage, but that the owners of the ship were answerable for the loss of the lard, and liable to pay them more than six thousand dollars, and claim to recoup against the freight and primage so much of the damage as they may have sustained as will be sufficient to liquidate and discharge the amount claimed for freight. When they answered the respondents, they at the same time filed a libel against the owners of the ship, propounding substantially the particulars of what was in their answer to the libel—so much so, that we will not repeat them; indeed, there is no addition to it, nor will it be necessary to set out again the articles of their answer to the libel filed against them, for they are a repetition of their own original libel, except in one particular, upon which the controversy was made exclusively to turn by the counsel on both sides in the argument of the case before us. That was, that the lard, as such, had not been in good order for shipping when put on board of the ship, inasmuch as it was then in a liquid state, and had in that condition been put into barrels and tierces, which, with the heat of the weather then and during the passage to New York, had started them, and had caused the leakage complained of before and during its transportation, and that the leakage had not been caused by any neglect or want of care of them, either in shipping the lard at New Orleans, or on the passage thence to New York, or in stowing it in the ship, or in the discharge of it in New York. There is

much testimony in the record in respect to the effect of heat and barreling of lard in a liquid state, in producing more than usual leakage; but it was urged in the argument that such proofs were inapplicable to this case; as the bills of lading affirmed that the lard, when shipped, was in good order and condition, and were conclusive against the allowance of any inquiry being made, or to any other causes of loss or damage than such as may have been caused by the dangers of the sea and fire.

Such is not our view of the effect of the bills of lading we have now to consider.

We proceed to state what we believe to be the law, and will then apply the evidence to it to determine if this case is not within it.

We think that the law is more accurately and compendiously given by Chief Justice Shaw, than we have met with it elsewhere. In the case of *Hastings* vs. *Pepper*, (11 Pickering, 43,) that learned judge says: "It may be taken to be perfectly well established, that the signing of a bill of lading, acknowledging to have received the goods in question in good order and well conditioned, is *prima facie* evidence that, as to all circumstances which were open to inspection and visible, the goods were in good order; but it does not preclude the carrier from showing, in case of loss or damage, that the loss proceeded from some cause which existed, but was not apparent, when he received the goods, and which, if shown satisfactorily, will discharge the carrier from liability. But in case of such loss or damage the presumption of law is, that it was occasioned by the act or default of the carrier, and, of course, the burden of proof is upon him to show that it arose from a cause existing before his receipt of the goods for carriage, and for which he is not responsible." The same has been decided by this court in two cases as to the burden of proof, where the goods shipped were said to have been impaired in quality by the dampness of the vessel during passage to her port of delivery. *Clark* vs. *Barnwell*, (12 Howard, 272;) *Rich* vs. *Lambert*, (12 Howard, 347.)

The rule having been given, our inquiry now will be, whether or not the owners of the Maid of Orleans have brought them-

selves within its operation, so as to be exempted from all lia-
bility for the loss of the lard, by having proved satisfactorily
that it had been occasioned by causes existing in the lard, but
not apparent when it was shipped, to the extent of the injury
which those causes would produce upon the barrels and tierces
which contained it; or, in other words, that the causes of the
loss were incident to lard when operated upon by a heated
temperature of the sun acting directly upon it, or when it shall
be stored, and an excessive natural temperature has occasioned
its liquefaction. It is alleged that the loss of this shipment
was sixty thousand pounds less that the quantity shipped. It
must be admitted to be too large for it to be brought under the
rule which exempts the carrier from liability for the ordinary
evaporation of liquids, or for leakage from casks, occurring in
the course of transportation. The implied obligation of the
carrier does not extend to such cases, any more than it does
to a case when the liquid being carried, if it shall be conveyed
with care, is entirely lost from its intrinsic acidity and fermen-
tation, and bursting the vessel which contains it; as it was ad-
judged that the carrier was not liable when a pipe of wine
during its fermentation burst and was lost, it being proved
that at the time it was being carried carefully in a waggon
commonly used for such a purpose. *Farra* vs. *Adams*, (Bull.
N. P., 69.)

We do not know where an adjudged case can be found il-
lustrating more fully the exemption of a carrier from respon-
sibility for loss or leakage from the peculiar and intrinsic qual-
ities of an article, and the inquiries which may be made upon
the trial in respect to them, and into the causes of a loss from
effervescence and leakage, and we may say for its discrimina-
ting rulings, than that of *Warden* vs. *Greer*, (in 6 Watt's Penn.
Rep., 424.) Mr. Angel has made all of us familiar with it in
his Treatise on the Law of Carriers, ch. 6, 215. The action
was brought against the owners of a steamer on account of
loss on a cargo of two hundred barrels of molasses, which was
affirmed in the bill of lading had been received in good order
and well conditioned. Witnesses were examined as to the
trade in that article on the western waters; the nature of mo-

lasses and the trade in it; as to its fermentation in warm
weather; the effect upon it by heat in its removal and carriage
in a dray; also as to the means usually taken to prevent loss
of it, and injury to the barrels from the expansive force of fer-
mation; and as to the loss of it from those means and causes
on a passage from New Orleans to Pittsburgh; and as to the
loss by leakage or warm weather, according to the condition
of the barrels in which it might be, shipped.    It was determined
in that case that the defendants were not answerable for loss
occasioned by the peculiar nature of the article carried at that
season of the year, nor for leakage arising from secret defects
in the casks, which existed, but were not apparent, when they
were received on board of the steamer.

Nor is a carrier responsible for diminution or leakage of
liquids from barrels in the course of transportation, though
they are such as are commonly used for that purpose, if it shall
be satisfactorily proved that the barrels had become disquali-
fied from containing their contents by causes connected with
the nature and condition of the article, which the carrier could
not control.

Having stated the law as we think it to be, that a bill of
lading for articles shipped, affirmed to be in good order and
condition, is but *prima facie* evidence of that declaration, and
does not preclude the carrier from showing that the loss pro-
ceeded from causes which existed, but were not apparent, we
will now examine the testimony, to determine if such was not
the fact in this case.

The lard was taken from the warehouse, to be put on board
of the ship, in a liquid state, in the month of July, during
hotter weather—much hotter, all the witnesses say—than is
usually felt in New Orleans at that time.    This was known to
the shippers, to their agent, who made the freight by contract,
and to the captain of the Maid of Orleans.    They also knew
that the lard was in such barrels and tierces commonly used
for the shipment of lard.    All the barrels and tierces were put
on board of the ship, according to contract, as soon as it could
be done, after they were carted to the levee where the ship
was, except a few barrels, not more than 20 barrels, which

needed cooperage, and they were left on the levee from Saturday evening until Monday morning.

There is no proof of leakage or loss from them by that exposure, than there would have been if those barrels had been put on board of the ship in the bad condition in which they were sent to the levee. Dix, who made the freight engagement in behalf of the shippers, says it was expressly agreed that the lard should be taken on board of the ship as soon as the same was sent to the vessel, to avoid exposure to the sun; and he testifies that the casks containing it were in good order when they were delivered; but anticipating that some of them might not be, a cooper was sent, for the purpose of packing such of them as might not be in good shipping condition; and the witness Shinkle, the stevedore employed to load the ship, says the lard was promptly taken on board as soon as it was taken from the drays, but that there were about fifteen or twenty barrels leaking, which he caused to be rolled aside, and he put them under tarpaulins, to be coopered, and, as soon as they were coopered by the shipper's employees, it was taken. This is the lard, as we learn from another witness, which had been on the levee from Saturday night until Monday morning. Besides, from answers of Mr. Dix to the cross-interrogatories put to him, we learn that he knew nothing of the good order and condition of the casks of lard, as to its cooperage, when they were carried to the levee to be received for shipment, except from the report of those who had done the work. Under such circumstances, the casks put aside on the levee for cooperage, before they could be shipped, on account of their leaking, were not received by the stevedore, to be put on board, until they were put in a fit condition to be shipped. Until that was done, they were at the shipper's risk. We cannot, therefore, allow the fact of the exposure of these twenty barrels to charge the ship with any loss, or to lessen the weight of the testimony that, in receiving and putting the casks into the vessel, it had been done in conformity, as to time, with the engagement made with the agent of the shippers.

The proof is ample, that it was put on board with care, and in the manner and with all the appliances for doing so most

readily. It is in proof, also, that the stowage on the ship was good, both as to position and as to its support and steadiness, by dunnage and cantling, and that there had been no disarrangement of the casks, either by storm or rough seas, on the passage of the ship to New York, although she did encounter some heavy weather. Nevertheless, upon the discharge of the lard in New York, the barrels and tierces were found to be in a worse condition, and leaking more, than had ever been seen by either of the witnesses, whose habit and business had made them familiar with such shipments. It appears that the barrels containing the lard were of the same materials, and coopered with hoop-poles, as barrels for such a purpose are usually made.

When the contents of such barrels are solidified, the leakage will be small; when liquefied, larger. All of the witnesses, who know how such barrels are coopered, say so, particularly as to lard in a liquid state, and as to its effect upon the staves and hoops of such barrels when acted upon by the heat or rays of the sun. They know it from observation and experience; science confirms it from the composition of the article. This lard was of a secondary kind, or, as the witness Magrath says, it was a fair lard—not pure at all, but a good average lot, not a first-rate article. The differences in the qualities of lard may arise from a deficiency of oxigen, or from the inferior quality of the fat of the animal from which it is tried, and not unfrequently from a careless and insufficient melting and expression of the best of the animal fat from its membranous parts. Oils, whether animal or vegetable, are either solid or liquid, and, when in the first condition, are frequently termed fats. These fats are more abundant in the animal than in the vegetable kingdom. But whether liquid or solid, they usually consist of three substances, two of which (the stearine-suit and the margarine-pearl) are solid, and the other (elane or oleine) is liquid at ordinary temperatures. They are all from 6° to 9° lighter than water, and their liquid or solid condition depends upon the proportion in which their component parts are mixed. Thus, in the *fats*, the oleine exists in small quantities, and in the liquid oils it is the chief constituent. A certain degree of

heat is necessary to the mixture, for at low temperatures there is a tendency to separation; the stearine and margarine are precipitated or solidified, and if pressed, can be entirely freed from the oleine. The stearine from the lard of swine is easily separable from the oleine, and it is used in the manufacture of candles. The liquid stearine, known in commerce as lard-oil, is used for the finer parts of machinery; but all of the animal fats—such as those from the hog, the ox, the sheep, and horse—have not a like consistency or proportion of stearine in them; when deficient in either, or comparatively small, and tried into lard, they have not that tendency at low temperatures to precipitate and solidify as the stearine and margarine of the fat of the hog has; and being extremely penetrating from liquidity, there has always been a greater loss from evaporation and leakage from the barrels in which they are ordinarily put for transportation than there would be from hogs' lard under the same temperature; in other words, hogs' lard will solidify at a temperature at which those animal fats will not, and, from their liquidity, they escape from the barrels containing them in larger quantity; and that fact has been remarkably verified by the returns of English commerce with Buenos Ayres and Monte Video, in the importation from them of what is known there as horse or mare's grease, tried from the fat of the horse.

From its liquidity, the ordinary barrels for the transportation of tallow and grease were found to be insufficient, as the casks were frequently half empty on their arrival. The commerce in it was checked for some years, and not resumed until the shippers put it into square boxes, lined with tin, and the article is now carried without loss. And here we will remark, that a distinguished gentleman, thoroughly acquainted with the commerce of our country and its productions, and with its great lard production from the fat of the hog, has made a calculation of the deterioration of the article and the loss of it by leakage from the barrels and casks in which it is now shipped, and his result is, if we would change it for square boxes, lined with tin, that the cost of them would be a saving of the loss now sustained by barrelling it.

We have now shown that the cause of the leakage of lard is

its liquefaction under temperatures higher than those at which it will solidify when not deficient in stearine. One legal consequence from that fact is, that shippers of that article should be considered as doing so very much as to leakage at their own risk when it is in a liquid state, however that may have been caused, whether from fire or the heat of the sun, and knowing, too, that it was to be carried by sea at a time from places where there was the higher ranges of heat, through latitudes where the heat would not be less, until the ship had made more than three-fourths of her passage. Such was the case in this instance. When the lard was shipped, the thermometer had indicated for several days, and continued until the ship sailed, a heat of 97°; the ship itself had become heated by it. Her passage was made in the heat of the Gulf Stream until she made the capes of the Delaware, and the witnesses describe the heat of the hold as unendurable upon her arrival in New York.

We have still to show what were the effects of the liquid lard upon the barrels in which it was, and that we shall do briefly by the testimony of several witnesses, and from what we all know to be the additional pressure of an article upon a barrel when liquefied by heat. The pressure from liquid lard is an expansion of its component constituents by heat into a larger bulk than it occupies when solidified, and its elastic pressure distends or swells the barrel which contains it, until the hoops which bind it are slackened, and its staves are started; just as it would be in a barrel containing any other fluid expanded by heat or fermentation. The consequences must be a diminution of the liquid by an increased leakage and evaporation. Now, it so happens that the scientific explanation of the loss of the lard in this instance is verified by the experience of the libellants' and respondents' witnesses. Benzell, a cooper of forty years' experience in New York, in coopering casks of lard from New Orleans to New York, and who coopered this cargo upon its arrival, says the casks were of a good quality, except being slack—that is, hoops started; hoops were loose upon the casks; does not think there is any quality in lard to injure casks, except it will, when liquid, tend

to shrink them; it requires a great deal of care in such a case; pressure increases the difficulty from heat, conduces to press upon the joints, and produces leakage; these casks were fully wooden-bound, but saw them leaking at bilge and at head; coopered four hundred of them. Ward, the city weigher, and who weighed several hundred casks of this shipment, says that they leaked largely; leakage was from loose hoops. Dibble, another weigher of twelve years' experience in the article of lard, says the lard was in a liquid state, like oil. Wright, who was present all the time when the ship was discharging, gives an account of the stowing of the shipment; says the packages or barrels were slack. Samuel Candler, marine surveyor, surveyed the cargo in August, 1854; made seven surveys on cargo and one on hatch; saw the lard when on board of the ship; says it was stowed in the after lower hold in four or five tiers on bilge, and cantling in ordinary way and best; bilge and bilge stowing not so well; went below; it was very hot there; barrels looked fair, but slack; the staves were shrunk; looked all alike; top casks leaked as well as those on the bottom tier; attributes the great loss to great heat and shrinking of the barrels; has surveyed a great many ships laden with lard in hot weather; this cargo could not have been stowed better; recollects more of this cargo because there was so much leakage; noming stood on the casks, or on the top tier of them, as is afterwards explained; surveyed ship; she had the appearance of having encountered bad weather. Francis J. Gerean, who has been accustomed for thirty years with stowing cargoes, says: I coopered this cargo for libellants, Woodruff & Henning; when the cargo was discharging, two coopers under his direction, one at gangway on deck, the other in the hold of the ship; he saw the lard in the hold before delivered; the hoops were very loose, and the barrels were leaking from sides and heads; intensely hot below; considerably hotter than on deck; leakage from shrinking of packages; the lard was liquid; that tends to shrink; staves and hoops become loose; only chime hoops were nailed; barrels were well stowed; does not think it possible to stow better; ground tier was damaged, as well as he judged; bilge of barrels did not leak;

no barrel rested on a single barrel, but on others. Fisher, a large dealer in lard, grease, and tallow, and who has received them at all temperatures of weather, says lard brought in ves-sels in hot weather will naturally leak ten pounds out of a package; lard of reasonable quality, in good packages, will leak about the same as oil; thinks putting liquid lard into barrels will not produce leakage as much as pressure of the barrels upon each other, but stores lard in cellar three to five tiers. Several other witnesses in New Orleans concur in stating that it was very hot weather when the lard was shipped, and that when shipped it was in a liquid state. Others, un-contradicted, testify that it was liquid when the vessel arrived in New York.

There is no testimony in the case impeaching the skill and proper management of the ship on the passage to New York, or in the delivery of the lard there, or that there was any part of her cargo of a nature to increase the heat of the ship, or to liquefy the lard, or to alter or shrink the barrels, though the ship's heat, exposed as she had been to the rays of the sun in New Orleans, was higher than that temperature at which lard will solidify; and it consequently continued liquid, from the time it was received on board until its delivery in New York, as the ship, on her way to it, was never in a temperature low enough to solidify it.

All the witnesses who were examined in respect to the shrunken and slackened condition of the barrels when they were discharged in New York agree. Two or three of them say they were in a worse condition than they had ever seen or handled, and attribute the loss to the agency of the melted lard upon the barrels.

The result of our examination of these cases is, that though the owners of the Maid of Orleans could not controvert the affirmance in these bills of lading, that the lard of the shippers had been received on board of their ship in good order and condition, that they have made out, by sufficient and satisfac-tory proofs, that the leakage and diminution of the lard was owing to existing but not apparent causes, in the condition of the lard, acting upon the barrels in which it was, which are not

*Nelson et al.* vs. *Woodruff et al.*

.within the risks guaranteed against to the shippers by the bill of lading.. In conclusion, that the signing of a bill of lading, acknowledging that merchandise had been received in good order and condition, is *prima facie* evidence that, as to all circumstances which were open to inspection and visible, the goods were in good order; but it does not preclude the carrier, from showing that the loss proceeded from some cause which existed, but was not apparent when he received the goods, and which, if shown satisfactorily, will discharge the carrier from liability. In case of such a loss or damage, the presumption of law is, that it was occasioned by the act or default of the carrier; and, of course, the burden of proof is upon him to show that it arose from a cause existing before his receipt of the goods for carriage, and for which he is not responsible.

We accordingly with this opinion, affirm the decree of the District and Circuit Courts, in all particulars, dismissing the libel of Jno. O. Woodruff and Robert M. Henning, and also affirm the decree of the Circuit Court, with costs, to the libellants and appellees, Nelson, Dennison *et al.*, in all things expressed in the same.

We have not considered the point made in the argument, deeming it to be unnecessary, relating to James E. Woodruff & Co. having made advances, in a large sum of money, upon the faith of the bill of lading, as they were not made with any intention of acquiring property in or ownership of the lard.

We also concur entirely with the view taken by our brother Betts, of the District Court, upon the objections made to the admission of the deposition of Capt. Dennis, taken *de bene esse* by the libellants.

*Decrees of the Circuit Court affirmed.*