## THE PRUSSIA.

### (District Court, E. D. New York. June 23, 1898.)

CARRIAGE BY SEA—PRESERVATION OF REFRIGERATED MEAT—BILL OF LADING.

The storage and preservation of dressed meat in a refrigerator during the transportation thereof by a vessel is no part of the usual duty of a common carrier, and his obligation concerning the same may be a matter of contract; but, in the absence of contract, the law implies that a person contracting to furnish cold storage has used reasonable care and skill to provide suitable refrigerating machinery and plant, and that he will observe like care and skill to properly maintain and operate the same during the voyage. A person so furnishing cold storage may stipulate his precise duty and obligation, even to the extent of entirely relieving himself of liability, but law will not interpret a contract, so as to exempt such person from the exercise of due and reasonable care, unless such exemption is plainly and unequivocally stipulated. A provision in a bill of lading that the risk of due refrigeration shall be borne by the shipper, even though damage be caused by the neglect of the carrier's servants, does not excuse the carrier from the exercise of reasonable care to provide a proper plant for that purpose. Although a stipulation for exemption from liability be in part in contravention of law, and hence void, yet such portion as is otherwise valid may be preserved and enforced.

(Syllabus by the Court.)

This was a libel in rem by the Insurance Company of North America against the steamship Prussia to recover for loss occasioned by deterioration of refrigerated meat while in course of transportation by said vessel.

Wheeler & Cortis, for claimant.

Black & Kneeland, for libelant.

THOMAS, District Judge. The question presented in this action is as follows: Competent persons were employed by her builders to place in a new ship an apparatus which, when in order, and properly operated, sufficiently reduced the temperature in a room appropriated to carrying dressed meat so that such commodity might be carried safely. Previous trials of the machinery, first by the owners, and later, on May 29, 1894, under the supervision of the representatives of the makers, builders of the ship, and of the present shipowners, successfully tested its efficiency and mechanical working, and it did

in fact operate properly from Belfast to Hamburg, and from Hamburg to New York, where, on or about July 14, 1894, a full cargo was for the first time subjected to it; but on the second day out from New York the efficiency of the machinery was impaired, because a small piece of leather, from an unknown cause, was present in one of the valves, interrupting due action, and allowing the temperature to rise to such an extent that the meat deteriorated.

By what rule of law is the case governed? A common carrier warrants that he will deliver safely at their destination all goods whose carriage he undertakes, loss or injury from inevitable accident, or irresistible force, and lawfully exempted causes, excepted. But this warranty has never been thought to cover injury to goods from every cause, but rather to insure against any or all injuries, acts, and conditions extrinsic to the goods themselves. Against any or all injury resulting alone from the quality or constituent elements of the goods, it does not insure. For every outward act or agency save those excepted by law or contract, it is absolutely responsible; but for deterioration of quality, arising from the nature of the thing, it is not liable. If the damage proceeds "from an intrinsic principle of decay naturally inherent in the commodity itself, whether active in every situation, or only in the confinement and closeness of the ship, the merchant must bear the loss as well as pay the freight," unless the masters and owners are in fault, or unless their contract of shipment contains an insurance or warranty against such an event. Clark v. Barnwell, 12 How. U. S. 272, 282, where the damage done to cotton thread by dampness of the hold of the vessel, not occasioned by bad stowage, or any negligence of the master or mariners, was held to be an "accident of navigation," within the exception of the bill of lading. Hence loss from evaporation or leakage of liquids (Nelson v. Woodruff, 1 Black, 156, 161; Warden v. Greer, 6 Watts, 424; Ang. Carr. c. 6, 215), from intrinsic acidity and fermentation (Nelson v. Woodruff, 1 Black, 156, 161; Farrar v. Adams, Bull., N. P. 69) liquefaction of solids and consequent expansion, loosening the hoops of the containing vessel or barrel (Nelson v. Woodruff, 1 Black, 156, 166), are not within the warranty of the carrier.

In Carv. Carr. by Sea, §§ 12, 13, the rule is stated as follows:

"A further exception at common law, which was not expressly stated in the earlier cases, but is well established, is that a carrier is not responsible for a loss or damage which has resulted from an inherent quality or defect of the thing carried. For example, in the case of animals, he is not responsible for the progress of disease in them, or for injuries arising from their own vice or timidity,"—citing Nugent v. Smith, 1 C. P. Div. 423; Blower v. Railroad Co., L. R. 7 C. P. 655; Kendall v. Railway Co., L. R. 7 Exch. 373; Williams v. Lloyd, W. Jones, 179.

See, also, Clarke v. Railroad Co., 14 N. Y. 570; Bissell v. Railroad Co., 25 N. Y. 445; Cragin v. Railroad Co., 51 N. Y. 61; Mynard v. Railroad, 71 N. Y. 180; Evans v. Railroad Co., 111 Mass. 142; Wheeler, Mod. Law, Carr. 98, and the cases there cited.

The same author continues:

"So in the case of perishable goods, such as fruit and hides, he does not answer for their decay or deterioration; nor for the heating or weeviling of

grain; nor for fermentation, acidity, or effervescence in fluids, when these changes are the results of ordinary processes going on in the things themselves, without the aid of causes introduced by the shipowner. * * * Where, however, a loss which may be traced to an inherent quality or defect of the goods has arisen, not from the ordinary development of that quality or defect, but from adventitious causes introduced by the carrier, the same rule does not apply. So that, if the ordinary consequences have been aggravated by the manner in which the goods have been stowed in the ship, the shipowner is responsible, though it may not appear that there was any negligence in so stowing them."

This statement seems quite correct, save the suggestion that the carrier may be liable for adventitious causes, although no negligence appear. The liability of a common carrier can arise from an absolute obligation to carry safely at all events, or from default in not exercising proper care and diligence respecting the thing carried. Mynard v. Railroad Co., 71 N. Y. 180. Hence, if the carrier, by his negligence, introduces or permits the existence of adventitious causes, whereby the action of the inherent quality is detrimentally promoted, the carrier is liable. In other words, the duty of exercising some diligence rests upon the carrier, and this care must have reference to the nature of the goods carried. Goods of known tendencies to deteriorate should not be stowed or so exposed or so handled as to give activity to the harmful propensity. But how far must the carrier go in the direction of affirmative care? Goods prone to become damp, and to be injured thereby, should be placed in a dry hold; goods likely to be injured by absorbing foreign odors should be classed in stowage so as to escape deleterious contacts; goods of recognized peculiarity to injury from particular conditions should be removed from associations tending to produce such injury; goods that deteriorate from heat or cold should not be exposed unnecessarily to such influences. It may very well be that whatever has a tendency to be injured by heat or by cold should be assigned to a place, in the distribution of the cargo, where its disposition would not be excited; but this would not require the carrier to create an artificial climate adapted to the preservation of goods, and to warrant that the heat or cold thus furnished should be unvarying and efficient. Such an obligation upon a common carrier never existed, and there is no judicial suggestion of its propriety. Assume, then, that a carrier undertakes to add the business of cold storage to his regular occupation. Here is a duty not imposed by law, a duty totally unknown to the peculiar obligations of common carriers. The principle which imposes the obligation of an insurer upon a common carrier has no relation to it. Dressed meat has a tendency to decay. It is the primary duty of the shipper to make such provisions as shall arrest such tendency, or take the risk of the tendency. It is the primary duty of a common carrier, to the extent above stated, to introduce or to permit the introduction of no agency which will excite or develop such tendency. Aside from this he takes no risk. If the carrier undertakes the duty of the shipper, and thereby relieves the latter, the obligation must rest entirely upon contract, as the obligation of a common carrier does not require him to do so. This contract is quite collateral to the obligation of a common carrier, and hence may im-

pose such full or qualified obligations upon the bailee as the parties to it determine. In the present case, the business of refrigerating meat is superadded by the carrier. In the carriage of food supplies of this kind from the vast grazing countries of the world for distribution in different ports such a system of refrigeration is necessary from a commercial standpoint. Without it, the freight would, indeed, be carried in the usual undressed form, provided the cost of transportation and dressing at the port of delivery, or other place, rendered the commerce profitable. But the convenience or necessities of the shippers, and the markets supplied by them, justify and demand transportation of dressed meat, and to effect this result the minds of the shipper and carrier must meet in contract respecting the refrigeration. Such contract for cold storage on ship is of the same precise nature, and has the same latitude, as a contract for a similar purpose on land. It may take the form of an absolute undertaking, whereby the carrier—not as such, but as a bailee for hire— insures the shipper that until delivery of the meat its tendency to deteriorate should be arrested; or the bailee may warrant that he carries a refrigerator of a certain description and efficiency, in working order, and that the meat shall be placed and kept under its influence. Such was Sansinena v. Houston, 7 Asp. 150; Id. 311. In one case there is a warranty of safe delivery; in the other a warranty of the proper action of a suitable refrigerating plant. In the third case, the contract might be that the carrier would use reasonable diligence to provide and keep in efficient operation proper facilities for preserving the meat. See Townsend v. Rich (Minn.) 60 N. W. 545.

At this point it may be considered whether the carrier could engage in the business of cold storage and yet place the risk of the due construction and operation of the plant entirely upon the shipper, in which case the carrier would not be liable (1) for any lack of care in the construction or existence of proper devices for preserving the freight; (2) for any lack of care in the operation of such appliances. Logically, it is not apparent why two persons, at liberty to make or decline a contract, should not be free to stipulate just what should be provided, and what, if any, care should be used in regard to the thing provided. Negligence, in such a case, would arise from the breach of a contractual duty; and, as the carrier would be under no obligation to contract, he could, with the concurrence of the other party, appoint the duty which he was required to fulfill. If he did not assume duties, there could be no breach of them, and hence no liability. It is impossible to conceive that a person not obligated to do an act or to render a service may not contract with reference to it, with such limitation upon his liability as he may state with the consent of the other party. Where a common carrier is bound by law to carry, he may not absolve himself from all liability for due carriage, for he thereby negatives his duty to do what the law commands. But when the law commands nothing, the carrier, by contracting qualifiedly, denies nothing that the law requires of him. However, the law will not readily ascribe to a shipper the utter folly of contracting to send dressed meat by ship fitted with a refrigerator, and

at the same time of stipulating to take all the risk of the due construction and operation of the same. It has been considered that when a person offers facilities for cold storage, and receives goods for preservation, the law implies that such person warrants the provision of proper facilities, and the sufficient operation thereof. The Maori King v. Hughes [1895] 2 Q. B. 550; Queensland Nat. Bank v. Peninsular, etc., Co. [1898] 1 Q. B. 567, and cases there cited. Warehouse Co. v. Maxfield, 8 Misc. Rep. 308, 28 N. Y. Supp. 732, may also be consulted. However, in the absence of an express contract warranting safe stowage, it is consonant with the usual obligations of bailments of this nature that the law should imply that the bailee will use such reasonable care in the preparation of the refrigerating machinery and the operation thereof as a good business man, who undertook to preserve the meat, would exercise under the circumstances. The bill of lading in the present case stipulates that the Hamburg-American Packet Company had received from the shippers, to be transported by the steamship Prussia (in refrigerator), 600 quarters dressed meat, to be delivered in the like good order and condition as received at the port of Hamburg; and that the carrier should not be liable for loss or damage occasioned by heat, decay, putrefaction, rust, sweat, change of character, drainage, leakage, breakage, or any loss or damage arising from the nature of the goods, or the insufficiency of the packages. Stamped upon the bill of lading was the following:

### "Dressed Meat Clause.

"It is expressly agreed that the goods named herein are shipped and carried at the sole risk of the shippers or owners thereof, and that the shipowners shall in no case be responsible for any loss or damage thereof, or in any wise relating thereto, whether such loss or damage arise from defects or insufficiency either before or after shipment, in the hull of said steamer, or in her machinery, boilers, or refrigerating chambers machinery, or in any part of the refrigerating apparatus, or in any material, or the supply or use thereof, used in the process of refrigeration, and whether such loss or damage, however arising, be caused by the negligence, default, error in judgment of the pilot, master, officers, engineers, mariners, refrigerating engineers, or other servants of the shipowners or persons for whom they are responsible, or by negligence in stowage."

If the bill of lading were construed to contain a stipulation to deliver the meat in good order, this clause of exemption would relieve it, save so far as loss might arise from the bailee's negligence; for it will be observed that the stipulation, so far as it attempts to relieve the carrier from the results of negligence, concerns the negligence of those to whom the carrier stands in a relation of respondeat superior, and does not purport to relieve the carrier from injuries arising from its own negligence. Hence, if the injury resulted from the carrier's own negligence, it is liable. The duty relates to the furnishing of a proper refrigerating machine. This was a duty belonging to the principal, and was not remitted, so far as appears, to its servants. Before it can be known whether the bailee was negligent in discharging this duty, it must be ascertained what degree of care it was obliged to use to prevent defects of the kind existing in the present case. The advocate for the libelant likens the care to that required of a common carrier of passengers. Such a contention

cannot be sustained. The highest degree of diligence and skill is exacted of a common carrier of passengers because highly dangerous agencies are employed for the purposes of transportation, and the slightest misuse of the same may be destructive of human lives. There is no similitude between such a bailment and one to carry dressed meat in a refrigerator, when, in the absence of a warranty, only such reasonable care would be required as a good business man would observe under the circumstances. Men of high repute for skill and diligence were employed to construct the plant, and experts were provided to test it. The system itself was approved and satisfactory. The coils were, before the parts were marshaled, tested by currents of air and water passed through them. The combined machine was tested before the ship sailed from Belfast. It was operated between Belfast and Hamburg, and between Hamburg and New York, and there was no failure, and so for two days out from New York it worked unexceptionally. Meanwhile the little piece of leather had reached the valve, whose action it interrupted. An expert sent out by the manufacturer was present, but his skill was unavailing to discover the difficulty, and it was only after a prolonged examination after the ship came to port that the true cause of the interrupted function was revealed. In all this there was no lack of reasonable diligence. But how did the leather find its way in the coils of the tube? Was there any negligence in that regard? There is no evidence on this subject. It is conjectured that the leather might have come into the tubing while it was in the shop, or might have been disconnected from a leather washer by the action of the machine. This leaves nothing but the unexplained presence of the bit of leather from which to infer negligence. Does the condition itself indicate negligence? This would involve an application of the doctrine of res ipsa loquitur. But such doctrine has no application to the present case, and it is never correctly applied save "(1) where the relation of carrier and passenger exists, and the accident arises from some abnormal condition in the department of actual transportation. (2) Where the injury arises from some condition or event that is in its very nature so obviously destructive of the safety of person or property, and is so tortious in its quality, as, in the first instance, at least to permit no inference save that of negligence on the part of the person in the control of the injurious agency. This second class principally concerns injuries to people in the street from flying or falling missiles, obstructions, excavations, and the like, but may also include casualties in any relation where the elements stated in the definition are present." Thomas, Neg. p. 574. Moreover, it must be considered that great care and repeated experiments were had to discover whether there was any cause likely to impair the mechanical action. It is therefore concluded that the claimants were not negligent, and, as it has already been found that they lawfully stipulated against any contract of warranty, their liability is not established.

In reaching this conclusion, the argument of the learned advocate for the libelant has been studiously considered. As has been stated, the claimant, in providing a refrigerator, was not acting as a common

carrier. This stipulation for exemption in this regard did not concern its duty as a common carrier, but was a mere collateral undertaking, respecting which its liability would be measured by the terms of the contract made. The stipulation in some of its parts is inoperative, but such illegal limitation does not impair the valid provisions. It is not a rule, in the interpretation of contracts, that all is void because a part is prohibited; rather the valid should be separated from the invalid portions, and saved, if no injustice be thereby done to the contracting parties.

It is urged that The Maori King, supra, presents the law of this case. It is quite clear that The Maori King was decided upon the finding that the bill of lading contained an express warranty—and, that in any case, the law would imply one—that refrigerating machinery was fit to preserve the goods, and that the accompanying stipulation, sufficient to relieve the carrier after the voyage began, did not modify the warranty that the refrigerating machinery was, at the time of shipment, fit to carry the frozen meat in good condition. The stipulation in the case at bar distinctly provides for just such exemption, but does not relieve the claimants from the result of their own negligence, which, however, is not found to exist.

It may be proper to add that, in the opinion of the court, the Harter act has no necessary connection with this case, save so far as the third section thereof affirms the ever undoubted law that the carrier is not liable for losses arising from "the inherent defect, quality, or vice of the thing carried." The Harter act was intended to effect in some inscrutable way the liability of common carriers as such; to declare what common carriers, as such, could do, and what they could not do, and what their diligence in certain cases should avail them. It was not intended to control common carriers respecting duties entirely beyond their obligations as common carriers, which they might assume by contract. The libel must be dismissed, with costs.