## THE TAURUS.

(District Court, S. D. New York. December 15, 1922.)

1. **Shipping** ⚙⇒132(3)—**Burden rests on vessel to excuse delivery of cargo in bad order.**

Where a bill of lading recites receipt of merchandise in good order, the burden rests on the vessel to justify its delivery in bad order, or to bring the cause of damage within some exception of the bill.

2. **Shipping** ⚙⇒132(3)—**Ship held liable for damage to cargo.**

Claimant *held* not to have sustained the burden of showing that damage to a shipment of hides and furs, from wetting, was due to sweating or other cause exempted by the bills of lading.

In Admiralty. Suit by Alfred G. Thornton and others, trading under the firm name of Nicholson & Kellogg, against the steamer Taurus. Decree for libelants.

Bigham, Englar & Jones, of New York City (F. E. Single, of New York City, of counsel), for libelants.

Haight, Sandford, Smith & Griffin, of New York City (C. B. Smith, of New York City, of counsel), for claimant.

WARD, Circuit Judge. The libelants are holders of bills of lading for three shipments on the steamer Taurus on a voyage from Buenos Aires to Boston and New York, viz. 30 bales of tanned sheepskins opened at the ends, but wrapped around the middle by burlaps held in place by iron hoops, 500 loose dry hides, and three heavy wooden cases and one bale of fur skins.

The bills of lading were signed by the general agent of the steamer, which was chartered to Barber & Co., of New York, and had been making regular trips for them between Buenos Aires and New York for several years. The charter party, though produced when the deposition of Johannesen, the first officer, the only witness from the steamer, was taken April 4, 1918, was not offered in evidence. I therefore assume that Barber & Co. had complete authority to represent the steamer. The bills of lading described the goods as shipped in apparent good order and condition, and to be delivered in like good order and condition, and Johannesen testified that they were so received.

The steamer has a 'tween-decks and four holds, with a water-tight steel bulkhead aft of No. 2 hold, and another forward of No. 3 hold, each running from the main deck to the top of the bottom tanks, completely separating the cargo spaces from the engine and boiler rooms. She left Buenos Aires September 22, 1914, arrived at Boston October 21, and at New York October 27. Johannesen testified that dry hides discharged at Boston from the after part of No. 3 hold, in the middle of the hold above the tank tops, but near the wings, and also dry hides in the forward part of No. 2 hold halfway between the bottom tanks and the 'tween-decks near the wings, were damaged by water; no other dry hides around them being affected.

The libelants, upon the discharge of their shipments on the pier, discovering damage, notified their insurers, and one of them, Mr. Kellogg,

went with Mr. Waters, the insurers' surveyor, to the pier. There is no evidence as to the part of the steamer in which these shipments were stowed. Mr. Waters and Mr. Kellogg found a small number of the dry hides very wet; the burlaps covering the tanned sheepskins and the wooden cases containing the fur skins had dried out, but showed stains and spots of a smoky, whitish character; the ends of the bales of tanned sheepskins were very wet to the hand; one case of the fur skins was broken, and its contents found to be soaking wet.

Barber & Co.'s superintendent would not permit the cases and bales to be opened on the pier, so they were removed to a warehouse and subsequently examined. Though the libelants gave no direct notice to the steamer, Barber & Co. must have been aware of facts likely to result in a claim for damage. Kellogg and Waters say that fresh water, after drying, would not leave these whitish stains, but that salt water would. Mr. Waters, in addition, subjected the burlaps and cases to the very commonly used nitrate of silver test, and found a considerable precipitation of salt.

December 21, 1922, Mr. Kemp, surveyor for Barber & Co., examined 17 bales of tanned skins in the warehouse and found they had been thoroughly wet, but, in his opinion, not by sea water. He attributed the damage to sweat of the hold, or rain, or condensed steam. He also said that the nitrate of silver test was a good negative test; i. e., if no salt were shown, damage could not be by sea water, but some salt might be shown because there is salt in all animal matter. However, he admitted that a large precipitation of salt would indicate damage by sea water.

[1] Under these bills of lading, the burden lay upon the claimant either to justify its delivery in bad order or to bring the cause of the damage within some exception in the bill of lading, Nelson v. Woodruff, 1 Black. 156, 17 L. Ed. 97; Andean Co. v. Pacific Co. (C. C. A.) 263 Fed. 559.

[2] The controversy is as to whether the damage was caused by sea water, as the libelants contend, or by sweat, as the claimant contends. If by the latter, the burden of proving negligence lies upon the libelants, because of an exception of damage by sweat in the bill of lading.

Sweat, as the condensation of the air under deck, constantly forms on the sides and upper deck of steamers coming from South America to North America. It is less likely to happen to steamers leaving South America in the cold or winter climate, and arriving in the warmer or summer climate of North America, as was the case here. Precautions have to be taken, and, we may presume in favor of the steamer, were taken, for the protection of the cargo from sweat, such as keeping it away from the sides of the vessel by dunnage and battens, and by opening the hatches from time to time to ventilate the holds.

Johannesen admits that no extraordinary weather was experienced on the voyage, but says a fire did break out September 26 in the 'tween-deck bunker, situated between the two steel bulkheads above mentioned and separated from them. A copy of entries in the log offered in evidence by the claimant states that September 26 steam was injected for

about three hours, which extinguished the fire. September 29 the fire broke out again, and sea water was pumped into the bunker. On the 30th, at 9 a. m., it broke out again, and water was poured into the bunker, when necessary, and the fire extinguished at 7 p. m. "The water poured over the burning coals drained into the engine room bilges and stoke hole, and was immediately pumped out, never rising above the tank tops. It was, moreover, impossible for water which had been applied to the coals to come in contact with any cargo, as there were watertight steel bulkheads, both fore and aft of the engine room compartments, in which were the 'tween-deck bunkers."

The claimant contends that the damage was caused by sweat, or by the sea water poured into the coal bunker. If the damage to the hides discovered at Boston was caused by sweat, I should attribute it, in view of the very small part of similar cargo so affected, to defective protection at these two points against sweat. But I do not believe the considerable damage to the New York shipments, especially to the fur skins inclosed in heavy wooden cases, could have been so caused, considering the time of the year and that sweat damage is very rare in lower holds, and that so small a part of the whole cargo was affected. Nor do I see how sea water in the coal bunkers could get through the steel bulkheads and leave all the rest of the cargo unharmed, especially if it did not rise above the tank tops.

The claimant can hardly contend that the damage was so caused, in view of the extract from the steamer's log above quoted which it has offered in evidence. Therefore I see no ground for saying that the damage is a general average loss.

Johannesen, the first witness, was examined by deposition more than two years after the event and the trial took place some eight years after. The absence of the steamer's deck and engine room logs is very regrettable. Nor do we know where the damaged shipments were stowed, or what precautions in the way of battens, dunnage, or ventilation against sweat were taken. In my opinion the claimant has not brought the damage within the bill of lading exception of sweat. Therefore it has not sustained the burden of explanation that lies upon it.

The libelants may take the usual interlocutory decree.