## THE CAPE CHARLES.

### (District Court, E. D. North Carolina. July 6, 1912.)

### No. 66.

1. CARRIERS (§ 4*)—DISTINCTION BETWEEN COMMON AND PRIVATE CARRIER.

A "common carrier" is one who openly professes to carry for hire the goods of all who choose to employ him, and whose duty it is to carry for all who comply with the terms as to freight, etc.; while a "private

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

carrier" is one who, without being engaged in the business generally, undertakes to carry goods for hire in a particular case.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1; Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 2, pp. 1313–1319; vol. 8, p. 7607.

Who are common carriers of goods, see note to Wade v. Lutcher & Moore Cypress Lumber Co., 20 C. C. A. 521.]

**2. SHIPPING (§ 120*)—PRIVATE CARRIER—LIABILITY FOR INJURY TO CARGO— ACT OF GOD.**

Claimant undertook as a private carrier to carry for libelant on his schooner a quantity of corn, and hay and straw in bales, to be delivered at various life-saving stations on the coast of North Carolina. The time was winter, and libelant understood that the hay was to be carried on the deck and covered with canvas. Claimant signed receipts or bills of lading on printed forms containing conditions which, inter alia, exempted him from liability for loss or damage caused by act of God. While in the sound the schooner encountered a heavy snowstorm, with wind which blew the snow under the canvas, and although the canvas was kept down as well as possible, and the snow brushed off after the storm, the hay was damaged. *Held*, that the damage was due to act of God, and not to any negligence of claimant which rendered him liable under his contract.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 440– 448, 466; Dec. Dig. § 120.*]

In Admiralty. Suit by Aydlett Bros. against the schooner Cape Charles; D. B. Silverthorne, claimant and cross-libelant. Decree for cross-libelant.

E. F. Aydlett, of Elizabeth City, N. C., for libelants.

Thos. J. Markham, of Elizabeth City, N. C., for libelee.

CONNOR, District Judge. The testimony tends to establish the following facts: On December 11, 1911, libelants delivered to D. B. Silverthorne, captain and owner of the schooner Cape Charles, at Elizabeth City, N. C., the hay and straw, in bales, and corn, in sacks, described in the libel, pursuant to an agreement on his part to carry and deliver, in stipulated quantities, to different life-saving stations along the coast of North Carolina—all of which is set forth in the libel. The libelants aver that the schooner is a common carrier, engaged in carrying freight for libelants from Elizabeth City to Cape Hatteras and other life-saving stations along the coast of North Carolina. Libelee denies that said schooner is a common carrier, and avers that her owner made a special contract of carriage with libelants, whereby, for a stipulated sum, he agreed to carry and deliver the hay, straw, and corn—he to exercise ordinary care in the performance of the contract.

There is some controversy in respect to the condition of the hay at the time it was placed on the deck of the schooner. I find that it was in good condition, having been inspected and accepted by the inspector of the government. I find that it was known to libelants that the hay was to be placed upon the deck of the schooner and protected by being covered with canvas. At the time of receiving

the hay Capt. Silverthorne signed certain papers, which libelants insist are bills of lading. After delivering a portion of the hay and corn at several stations, the schooner went to her home at Aurora, where she remained until the last of December or 1st of January. While passing from Beaufort to Core Bank Station, being on the route to the places of delivery, the schooner encountered a severe snowstorm. The hay was covered with canvas, but the winds blew the snow under portions of the canvas, causing, when melted, damage thereto.

The only evidence on this point is that of Silverthorne and Bryan Rose, his employé on the boat. The former says that he went from Morehead to Core Bank Station, and, while in the sound was struck by a snowstorm.

"The hay was protected the best I could. I covered it up three different times while the storm was on. The wind would get under the canvas and blow it off. We would get up and put it back. We kept it down the best we could. The snow would blow under the canvas and blow on the hay. As soon as the snowstorm was over we uncovered the hay and raked the snow all off—all we could get off. The snowstorm commenced one afternoon and lasted through half the next day. We were in the open sound."

Rose said:

"We covered it up three times during one night. Wind was right smart and heavy. We were in Core Sound. After the storm was over we brushed it off. The snow went in on the hay."

Silverthorne went to the different stations, as directed; but the persons in charge of the stations refused to receive a part of the hay because it was damaged by reason of having been wet. The schooner was carried to Aurora, her home, with the hay, and libelants notified by Silverthorne that he would bring it back to Elizabeth City, if the freight was paid, or, if so directed, ship by rail. To this proposition they replied:

"We, of course, expect you to make good what damaged stuff you have on board. You remember we delivered it to you in good condition, and you were to cover with canvas and deliver same. We have been informed that you have not used canvas on same."

Silverthorne thereupon stored and later sold the hay at public auction, and holds the proceeds on account of balance due on freight. Twenty-five dollars was paid on account of freight at the time the hay was delivered.

Libelants contend that the schooner was a common carrier at the time of making the contract of carriage. This is denied. The evidence, in this respect, is meager and unsatisfactory. There is nothing in the testimony indicating in what capacity, or for what purpose, she was employed by her owner, or why she was at Elizabeth City. Mr. Aydlett simply says that he made a contract with him to take forage to the life-saving stations at a stipulated freight. It does not appear that they had, at any former time, employed her, or that her owner had sought such employment from libelants or others. Mr. Aydlett was asked the questions:

"You had shipped hay before, hadn't you? Ans. Yes. And since? Ans. Yes, sir."

These questions, however, were asked in regard to his knowledge as to the manner in which the hay was to be loaded and protected. Capt. Silverthorne says that his home is at Aurora; that he is a sailor—has been for 18 years; that he knows the waters of the Albemarle Sound and its tributaries; that he has carried cargoes of almost all kinds.

[1] The distinction which marks a common from private carrier is clearly defined. A common carrier is one who openly professes to carry for hire the goods of all such persons as may choose to employ him. Redman's Law of Railway Carriers (2d Ed., 1880) 1. In some cases it is said that the test whether one comes within the definition of a common carrier is whether he holds himself out to carry goods for every one who applies to him. Simpson, C. J., says:

"The true test of the character of the party, as to the fact whether he is a common carrier or not, is his legal duty and obligation with reference to transportation. Is it optional with him whether he will or will not carry for all? If it is his legal duty to carry for all alike who comply with the terms as to freight, etc., then he is a common carrier, and is subject to all those stringent rules which, for wise ends, have long since been *adopted and uniformly enforced, both in* England and in all the states, upon common carriers." Piedmont Mfg. Co. v. Columbia, etc., R. R. Co., 19 S. C. 353; 16 Am. & Eng. R. R. Cas. 194.

"A private carrier is one who, without being engaged in such business as a public employment, undertakes to deliver goods in a particular case for hire or reward." Pennewill v. Cullen, 5 Har. (Del.) 238.

"One who is the owner of a vessel, and who is especially employed to transport a cargo of grain, is not a public carrier, but only a private carrier for hire." Allen v. Sackrider, 37 N. Y. 341; Bennett v. Filyaw, 1 Fla. 403; 6 Am. & Eng. Enc. 242.

[2] I am of the opinion that, upon the testimony in this case, the schooner Cape Charles was a private carrier for hire, and that the extent of its liability for the injury sustained by the hay is fixed by terms of the contract, and not by the principles and rules of the common law. It appears that Silverthorne, at the time the goods were delivered and placed upon the deck of the boat, signed several printed forms of bills of lading used by the Norfolk Southern Railway Company. The name of the railway company was written over in pencil with the words "Schooner Cape Charles." The printed portion of the bill of lading acknowledged the receipt of property written in as the hay and corn. The printed portion contained the usual provisions of the "Standard Form Straight Bill of Lading." They are signed by "D. B. Silverthorne." On the back is printed, among other "conditions," the following:

"No carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy," etc.

This limitation of liability is, of course, valid without regard to the character of the carrier. Silverthorne, who is evidently a man of little education, says that he cannot read and did not know that the papers to which he attached his name were bills of lading—thought that it was a simple receipt for the goods. While I do not think it very material, I incline to the opinion that his statement, in this

regard, is true, without attributing any improper conduct to the libelants. Assuming that the limitation, in respect to liability, is valid, the question arises whether the injury to the hay was caused by the act of God, or by the negligence of Silverthorne. It will be noted that the manner of loading the schooner—that is, the part of the boat upon which the hay was deposited to be carried—was known to the libelants. They saw the loading, by their agents, on the deck. It will be further noted that libelants knew that the hay was to be protected from the weather by the use of canvas. They were also familiar with the route to be taken and the waters over which the hay was to be carried to the points of destination. No fault can, therefore, be imputed by reason of the placing the hay on the deck of the schooner, nor for using canvas for its protection.

It is conceded by counsel that the hay was not injured prior to the time that the boat left Aurora, after the Christmas holidays—that is, about the 1st of January, 1912. The case is thus brought within a narrow compass in respect to the time, place, and manner of the injury. It was between Beaufort and Core Bank Station—while on the Sound—and by reason of the schooner encountering a severe snowstorm, lasting a part of two days and one night. The wind blew the snow under the canvas, and, notwithstanding the efforts of the owner and his employé, wet the hay. This is all without controversy. That a snowstorm, with wind, etc., is an act of God, both in contemplation of law and the proper interpretation of the contract, is manifest. In Ballentine v. North Mo. R. R. Co., 40 Mo. 491, 93 Am. Dec. 315 it was held that, where a carrier was delayed by a snowstorm, he was not responsible. The storm was the act of God. So of the freezing of a canal. 1 Am. & Eng. Enc. 499.

The sole question remains: Was the snowstorm, with the accompanying wind, the proximate cause of the injury; or did the libelee carry the burden to anticipate and make provision to protect the hay from the effect of such a storm. I think it clear that, in view of knowledge on the part of the libelee the contract of carriage involved the necessity for passing through the Sound, the duty was imposed to make such provision for the protection of the hay against the usual and natural danger which a storm involved which a reasonably prudent man, under similar circumstances, would make, and in doing so he should have kept in mind the season during which the voyage would be made—that it was midwinter. The measure of duty, in this respect, is laid down by the Supreme Court in Railroad Co. v. Reeves, 10 Wall. 176, 191 (19 L. Ed. 909):

"When the carrier discovered himself in peril by inevitable accident, the law requires of him ordinary care, skill, and foresight, which it defines to be the common prudence which men of business and heads of families usually exhibit in matters that are interesting to them."

Tested by this standard, I am unable to find that the owner of the schooner was guilty of negligence. The place on the boat and the means of protection from damage to the hay were known and assented to by libelants. They must be read into the contract of carriage as fixing the measure and standard of duty in those respects. The un-

contradicted evidence shows that the carrier provided the canvas and, I think, made such use of it as, under the circumstances, his contractual obligation required. A severe snowstorm, with high wind, raging during a part of two days and all night—the schooner in the Sound—it would seem imposed no higher duty than the efforts made to prevent the snow being blown under the canvas and upon the hay. The duty to remove the snow, as far as possible, was met. Common experience teaches that the penetration of snow driven by the wind is exceedingly difficult to prevent.

Upon considering the entire evidence, I am unable to fix any actionable negligence upon the owner of the schooner. This conclusion is not affected by the question as to the burden of proof to show negligence. It is held in Railroad v. Reeves, supra, that it is upon the libelant. No complaint is made of the manner in which the hay was disposed of, or the sum received therefor. The libelee is, of course, liable for the sack of corn and bale of straw short. No allowance for demurrage will be allowed. A decree will be drawn for libelee for the balance of freight, after deducting the proceeds of the sale of the hay and the value of the corn and straw which were not delivered.

Neither party will recover for witnesses attending upon the hearing. The balance of the cost will be taxed against the libelants.