## THE POINT BRAVA.

## PENNANT OIL & GREASE CO. v. SWAYNE & HOYT, Limited.

District Court, N. D. California, S. D.
Oct. 18, 1932.

McCutchen, Olney, Mannon & Greene, of San Francisco, Cal., for libelant.

Lillick, Olson & Graham, of San Francisco, Cal., for respondent.

SHEPPARD, District Judge.

This is a libel to recover cargo damage. The jurisdictional facts are stipulated. It is further stipulated that respondent and the steamship Point Brava received at the port of New Orleans, La., approximately 147,131 gallons of lubricating oil for transportation to the port of Los Angeles, Cal., that said oil was stowed in the deep tank of the said Point Brava, and did not contain any salt water in it at the time it was received by respondent, and that upon delivery of the cargo at Los Angeles it contained a certain amount of salt water, the presence of which was caused by sea water entering the vessel's deep tank during the voyage through leaky rivets in the shell plating of the vessel; that at and for some time prior to the voyage in question, the respondent owned and operated a fleet of vessels engaged in the business of carrying general cargo between regular ports on the Gulf of Mexico and other regular ports on the Pacific Coast. It was proved that the respondent had carried other cargoes of oil in the deep tanks of its vessels, including the Point Brava, prior to the voyage here in question.

The contract of affreightment contained the following provision: "At least five days prior to the loading of the oil of the vessel of the carrier, a competent marine surveyor shall be employed by the shipper and at the shipper's expense for the purpose of inspecting the deep tank or tanks of the vessel in which the lubricating oil is to be transported. * * * If upon the completion of inspection, the surveyor approves the vessel's tanks for the transportation of bulk light-colored lubricating oil, the surveyor shall issue a certificate stating that the said tanks are sound and in satisfactory condition for the safe carriage of such bulk light-colored lubricating oil and said certificate when issued by the surveyor shall be deemed by the parties here-

to to be conclusive evidence that the vessel's tanks are in all respects seaworthy and proper for the carriage of said lubricating oil. Two copies of surveyor's certificate shall be delivered to carrier upon the vessel's departure from loading port. In the event that during such inspection or testing of vessel's tanks, defects in said tanks or in their condition, such as would render them unfit for the transportation of bulk light-colored lubricating oil, are disclosed, the surveyor shall recommend the nature of the repairs or cleaning to be effected or the procedure to be followed in remedying such defective condition, and if said repairs can be effected or said defective condition remedied within five days prior to the date on which said lubricating oil is to be loaded and at a reasonable expense, the carrier agrees to effect such repairs or remedy such defective condition."

It was established by proof that the Point Brava was not in a fit condition for the carriage of cargo oil upon her arrival at Mobile, Ala., on or about the 8th day of December, 1931, just prior to the voyage here in question, due to the leaky condition of several rivets in the sides of the vessel which formed the sides of her deep tank. This defect was discovered by the surveyor who was employed by shipper in accordance with the agreement of the parties above quoted.

The inspection of this surveyor consisted of a visual examination of the inside of the tank together with a hammer test of rivets, the condition of which appeared doubtful. Several rivets were renewed or repaired upon his recommendation and a hose test was then applied to the outside of the vessel at the points where the repairs were made. The vessel then proceeded to New Orleans, where she arrived on December 10, 1931, and began loading cargo within thirty minutes after her arrival. A visual inspection of the deep tank was made at New Orleans. The inspection and test at Mobile consumed about three hours and that at New Orleans about fifteen minutes. No hydrostatic test was applied at either place, even after it was found that some repairs were necessary. There was no lack of expert testimony produced by both parties as to the efficacy and necessity of hydrostatic tests; but it appears that the weight of expert opinion is to the effect that due diligence would require a hydrostatic test of a vessel's deep tank before loading it with cargo of the nature here involved, if any repairs were found to be necessary, due to the fact that such repairs would tend to weaken the rivets in the shell plating of the vessel adjacent to the rivets repaired.

Respondent's witnesses testified that the vessel encountered rough weather and winds at times blowing forty miles per hour in the Carribean Sea, and again in or off the Gulf of California, upon her return voyage. However, it was not shown that this was unusual or unexpected weather for the times and places where it was encountered.

The bill of lading covering the shipment in question contained a provision that the carrier should not be liable for any damage to cargo unless claim therefor in writing was served on the carrier within fifteen days after the removal of the cargo at port of discharge. It was admitted that within fifteen days after the vessel discharged her cargo the libelant wrote and the respondent received several letters, one of which contained the following warning: "Referring to our letter of January 2nd, we are accepting this shipment of lubricating oil subject to damage caused by contamination of the oil by water while the oil was in your possession. We are holding you liable for this damage."

The principal defenses of respondent are:

1. That due diligence was in fact exercised to place the vessel in a seaworthy condition prior to the commencement of the voyage, and that the damage was caused by perils of the sea.

2. That libelant is estopped to raise the question of lack of diligence or seaworthiness on account of the certificate of libelant's surveyor as to the fitness of the vessel, made in accordance with the agreement of the parties.

3. That the letter of libelant did not constitute written claim for damage within the terms of the provision in the bill of lading.

In the light of the evidence the respondent was a common carrier within the accepted definition, 10 C. J. 39; The Cape Charles (D. C.) 198 F. 346; and as such, under the Harter Act §§ 1–5, 46 U. S. C. §§ 190–194 (46 USCA §§ 190–194), the burden of proof was upon it to establish that it exercised due diligence to have the Point Brava in a seaworthy condition at the commencement of the voyage in question, Martin v. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794.

By "seaworthiness" is meant that the vessel must be in a reasonably fit condition to

368

carry the particular cargo offered safely upon the particular voyage intended. The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; Franklin Fire Ins. Co. v. Royal Mail Steam Packet Co. (C. C. A.) 58 F.(2d) 175. The question of the exercise of due diligence to have the vessel in such condition is one of fact, Philippine Refining Corp. v. U. S. (D. C.) 29 F.(2d) 134, 135, which must be proved by a showing of what was actually done to this end, and that this was all that could reasonably have been expected to have been done.

■■■ The fact that after it was found that rivets were leaking at Mobile, and repairs were made, a hydrostatic test was not adopted, was, under the preponderance of the expert testimony, evidence of lack of diligence on the part of the respondent. This lack of diligence, when considered in connection with the undisputed fact that the vessel did leak and the cargo was damaged, is sufficient to raise a presumption that the vessel was not seaworthy at the commencement of the voyage. Nelson et al. v. Woodruff, 1 Black, 156, 17 L. Ed. 97.

■ Respondent's contention that it was absolved from its duty to exercise due diligence, and from liability for failure to do so, by virtue of the agreement of the parties as set out in the contract of affreightment that libelant should employ a surveyor whose certificate of fitness should be conclusive evidence thereof, is untenable. Such provisions are void under the Harter Act, supra. The fact that the surveyor in the instant case was to be selected by the shipper, and was to some extent the shipper's agent, is not enough to bring this clause of the contract outside of the provisions of the Harter Act as construed in Philippine Refining Corp. v. U. S., supra. It is immaterial whether the surveyor is named in the contract and agreed upon by the parties or whether his selection is left to the shipper. The duty of the carrier is to use due diligence regardless, and this duty is nondelegable. International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; Bethlehem Shipbuilding Corp. v. Joseph Gutradt Co. (C. C. A.) 10 F. (2d) 769; The Abbazia (D. C.) 127 F. 495.

■ Respondent's contention that libelant has not made claim for damage within the terms of the contract is without merit. Libelant's letters plainly stated that they were so claiming, and even if this were not enough, the fact that suit was filed within the time limit is adequate.