UNITED STATES of America, Plaintiff,

v.

ONE (1) LIBERIAN REFRIGERATOR VESSEL, M/V EA, Official No. 3524, approximately 100.41 meters in length, Defendant.

BANQUE FRANCAISE DU COMMERCE EXTERIEUR, Intervening Plaintiff,

v.

M/V EA, its engines, tackle, apparel, appurtenances, etc., in rem, and Ea Shipping Company, Inc., her owners, in personam, Defendants.

EA SHIPPING COMPANY, INC., Plaintiff,

v.

Albert F. BAZEMORE, Regional Commissioner of Customs, Edward Ellis, District Director of Customs, David Greenleaf, Acting District Director of Customs, Commander B. R. Sheaffer, United States Coast Guard Commanding Officer, Tampa, and ALL OTHER U. S. Officials and Employees who Seized and took Possession of the M/V EA on or about June 19, 1976, and thereafter whose names are unknown, Defendants.

Nos. 76–586 Civ. T–K and 77–178 Civ. T–K.

United States District Court, M. D. Florida, Tampa Division.

Dec. 14, 1977.

Anthony J. LaSpada, Asst. U. S. Atty., Tampa, Fla., Richard S. Friedland, Asst. Regional Counsel, U.S. Customs, Miami, Fla., for plaintiff.

Richard W. Hulbert and Mark A. Walker, Cleary, Gottlieb, Steen & Hamilton, New York City, and Jack C. Rinard, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for Banque Francaise.

Dewey R. Villareal, Jr., Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, Fla., Edwin Longcope, Hill, Betts & Nash, New York City, for Ea Shipping Co., Inc.

Martin H. Sachs, Atty., Dept. of Justice, Washington, D.C., for third party defendant.

## MEMORANDUM OF DECISION INCLUDING FINDINGS AND CONCLUSIONS

KRENTZMAN, District Judge.

In No. 76–586 Civil, the libelant, United States of America, seeks the forfeiture of the Motor Vessel Ea pursuant to 49 U.S.C. § 781, 21 U.S.C. § 881, and 19 U.S.C. § 1594, libelant contends that the M/V Ea was used to facilitate or aid in the importation of cocaine, a controlled substance, into the United States. Jurisdiction is founded on both 28 U.S.C. § 1345 and § 1355.

In No. 77–178 Civil claimant Ea Shipping Company, Inc. seeks damages for an alleged illegal seizure. Determination of the damage claim was deferred, and in August, 1977, the Court conducted a non-jury trial on the issues presented in the forfeiture case.

In this memorandum of decision the Court makes findings and conclusions as hereinafter set out.

A three-tiered approach is required for a proper analysis of the issues raised. The Court must first determine whether the libelant has proved probable cause for the seizure of the vessel. If the Court finds probable cause, then the burden shifts to the claimant to establish by a preponderance of the evidence its status as a common carrier pursuant to 19 U.S.C. § 1594, 21 U.S.C. § 881, or 49 U.S.C. § 782. A determination by the Court that claimant was a common carrier returns the burden to the libelant to prove that either the owner or master of the M/V Ea was privy to the illegal activity or a consenting party thereto. A negative finding on the probable cause issue would then permit claimant to proceed with its damage action presented in the companion case. A positive finding of probable cause and a negative finding regarding the Ea's common carrier status would terminate the litigation in the libelant's favor. Although these are not the sum total of issue permutations presented, this brief introduction should provide an overview of the legal controversies presented.

## BACKGROUND

The M/V Ea is a one hundred meter refrigerator vessel of Liberian registry. For approximately two years prior to her seizure on June 19, 1976 the Ea had participated in the banana trade between Tampa, Florida and Turbo, Colombia. This trade consists primarily of the carriage of bananas, yams, and plantains from Turbo north to Tampa, and the transportation of banana packaging materials, essentially container board, south from Tampa to Turbo. Although the Ea has deviated roundtrip from Tampa to Turbo, and traveled to Ecuador on occasions, it did so only because of the dearth of produce in Turbo.

Turbo is a small village near the Gulf of Uraba in the northwest corner of Colombia. The majority of the village's 2,000 inhabitants are occupied in some way in the produce business, either directly in the agricultural process, in the construction of boxes

or in a stevedoring capacity. Additionally, although a good deal of the surrounding terrain is dense jungle, there are substantial banana plantations extending about twenty miles inland. Since Turbo is situated on Bahia Turbo, a large but relatively shallow bay, and not the Gulf of Uraba itself, it is impossible to land-load vessels of the Ea's class. Therefore, banana trading vessels must anchor southwest of Turbo in the Gulf of Uraba in 4 to 6 fathoms of water. Barges laden with produce and mechanical loading equipment, primarily conveyors, are brought alongside the vessels which are then loaded through their sideports. Once started, loading continues day and night. Although mechanical conveyors are used, a good many stevedores are employed, and work under only cursory supervision.

Tampa, Florida is a port city with a population, including the surrounding communities, of close to one-half million people. Tampa is precisely due north of Turbo, although direct sailing is prohibited by the western tip of Cuba. Generally, the voyage between the two cities took from three to four days. For at least two years prior to its seizure, the Ea had been time-chartered by Parker Banana Company, a Tampa based importing company. In Tampa, Parker had retained Marine Agency of Tampa as its agent to handle the loading and unloading of the Ea and resolve any problems which might develop.

## 1. PROBABLE CAUSE FOR SEIZURE

### A. Findings

The M/V Ea had a history of unlawful importation of controlled substances into the United States prior to its seizure on June 19, 1976. On two previous occasions, May 14, 1974 and August 5, 1975, the United States Customs Service had imposed penalties upon the Ea for drug related activities. Additionally, the Acting Director of Customs on August 13, 1975 had written to Marine Agency of Tampa regarding special enforcement procedures to be applied to

the Ea from that date until December 31, 1975 because of the previous violations.[1]

Upon the Ea's arrival in Tampa on June 15, 1976, the Customs Service dispatched one of its officers to conduct surveillance of the vessel. This special surveillance was precipitated by the Ea's past record. Custom Patrol Officer (CPO) Bruce Meader (hereinafter referred to as Meader) had the responsibility of conducting the surveillance of the Ea on both the nights of June 15 and June 16, 1976. Around midnight on the night of June 16, 1976 and during the early morning of June 17, 1976, Meader parked his customs patrol automobile near the bow of the Ea approximately twenty yards from the vessel's gangway. Because of the previous surveillance, Meader had become acquainted with some of the faces and names of the Ea's crewmembers. Meader did not continuously maintain his position at the bow of the Ea but would on occasion drive to other areas in the adjacent Tampa port area. Each time upon his return to the vessel he noticed that a crewmember, who was serving as a deckwatch, would immediately leave the vessel and begin to ride a bicycle around the adjacent pier. Officer Meader believed that the crewmember's actions might be a signal and he decided to drive his automobile away from the pier and continue his surveillance in a more surreptitious manner.

Upon assuming his covert position sometime between 2:30 and 2:45 a. m., Meader, at times using his binoculars, noticed several men, whom he identified as Ea crewmembers, leave the vessel and assemble beneath or around the gangway. Further surveillance revealed the crewmembers were unloading dark colored trash bags through the second porthole.[2] Upon viewing this activity, Meader returned in his automobile to the Ea, proceeding at a high rate of speed. The men around the gangway, noticing the return of the customs patrol automobile, immediately dispersed, running in the direction of a nearby field. Meader commenced an immediate though

1. Government's exhibit 5a.

2. Government's exhibit 1c.

cursory search of the surrounding area, but he was unable to locate any of the men. He then departed the central dock area and proceeded to search the roads adjacent to the field. Not finding any of the crewmembers, Meader returned to the field into which the men had run and commenced a thorough search on foot. With the assistance of several Tampa Police Officers and a police helicopter equipped with a search light, four packages, each wrapped in dark plastic trash bags and wrapped with heavy plastic twine, were discovered. Inside each of the packages were several individually wrapped containers the size of small footballs. Meader opened one of these containers, field tested the substance found within and determined that it was cocaine. The search of the field continued for about an hour and all four of the packages which had been found were placed in the trunk of Meader's automobile. When the packages eventually were taken to the Tampa Customs House later in the morning, the collective weight was determined to be 95 pounds.

Soon after the discovery of the first package containing cocaine, Meader had contacted the Customs Patrol headquarters to report the incident. About 4 a. m. a number of supervisory and regular Customs Patrol officers arrived at the M/V Ea and began a search of the vessel. Meader did not participate in the internal search of the vessel at that time, but remained on the pier and was able to identify the second porthole as the opening through which the plastic trash bags had been passed. An examination of the second porthole revealed that it was unlocked whereas the next porthole was locked and the other portholes in the general area of the gangway, because of the curvature of the vessel, were too distant from the pier to permit the passage of packages. Meader at this time also identified one of the crewmembers as one of those whom he had seen around the gangway. This identification was confirmed by a peculiar grease stain on the crewmember's clothes. Meader had received an identical grease stain from a steel cable which secured the Ea to the pier when he had leaned over the water between the pier and the vessel at porthole # 2.

After taking the first four packages of cocaine to the Tampa Customs House, Meader and some additional customs patrol officers returned to search the area around the Ea. Searching in the field where he found the first package of cocaine, Meader located three additional packages wrapped in plastic trash bags, weighing in all about 63 pounds. A field test of the contents indicated the substance was cocaine. John Brooks, also a Customs Patrol Officer, with the assistance of a specially trained labrador retriever, located a small, (2½) pound, wrapped container of cocaine in the field. Also on June 17, 1976, Customs Patrol Officer Hayes found a dark colored trash bag floating in the water between the Ea and pier. The package was retrieved and was determined to be a 13 pound package containing cocaine. Meader, who assisted in an internal search of the Ea on June 19, 1976, located twine or rope in the ship's paint room which matched that used to tie the packages of cocaine found in the field. On June 19, 1976, Customs Patrol Officer Devine found a package of trash bags which resembled those used to wrap the cocaine in a cabin for two crewmembers on the Ea. At least one of the crewmembers occupying the room where Porthole # 2 was located was identified by Meader as one of those who was beneath the gangway of the Ea during the early morning of June 17, 1976.

Although searches of the Ea continued after the vessel had been formally seized on June 19, 1976, and several additional packages of cocaine were located in the crew's wash area, the Court is of the opinion these additional facts occurring after June 19, 1976 have no relevance to the determination of whether there was probable cause for the seizure of the Ea.

B. Conclusions of Law

■ Since the inception of United States Customs Laws it has been the burden of the government to show probable cause for the seizure of vessels against which forfeiture proceedings are commenced. *Rubin v.*

*United States,* 289 F.2d 195, 200 (5th Cir. 1961). In the instant case, the government seized the M/V Ea on June 19, 1976 and instituted this forfeiture proceeding on July 26, 1977. Although the term probable cause is susceptible of diverse definition, its meaning in the context of a forfeiture proceeding is well settled. "It is safe to say that it [probable cause] means less than prima facie legal proof and no more than 'a reasonable ground for belief in guilt.'" *Carroll v. United States,* 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *Bush v. United States,* 389 F.2d 485, 489 (5th Cir. 1968); *Ted's Motors v. United States,* 217 F.2d 777, 780 (8th Cir. 1954). Thus, "probable cause in forfeiture proceedings is something more than mere suspicion and must be generally regarded as reasonable under all the circumstances." *Bush, supra* at 489, and *United States v. One 1955 Ford Sedan,* 164 F.Supp. 729 (D.C.Md.1958).

Both the government's letter of seizure and libel assert as the principal ground for the forfeiture of the M/V Ea three federal statutes: 19 U.S.C. § 1595a(a), 21 U.S.C. § 881, and 49 U.S.C. § 781. The Tariff Act of 1930, Title 19 U.S.C. § 1595a(a) provides:

> Except as specified in the proviso to Section 1594 of this title, every vessel, . . or other thing used in, to aid in, or to facilitate, by obtaining information or in any other way, the importation, bringing in, unlading, landing, removal, concealing, harboring, or subsequent transportation of any article which is being or has been introduced, or attempted to be introduced, into the United States contrary to law, whether upon such vessel, . . or other thing or otherwise, shall be seized and forfeited together with its tackle, apparel, furniture, harness, or equipment.

Additionally 21 U.S.C. § 881 in pertinent part states:

> (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . . . .
>
> (4) All conveyances, including aircraft, vehicles, or vessels, which are used, or

are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) [relative to controlled substances] or (2), except that—

> (A) No conveyance used by any person as a common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this section unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to a violation of this subchapter
>
> . . .

Finally, Title 49 U.S.C. provides at § 781:

> (a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any vessel, vehicle, or aircraft; (2) to conceal or possess any contraband article in or upon any vessel, vehicle, or aircraft, or upon the person of anyone in or upon any vessel, vehicle, or aircraft; or (3) to use any vessel, vehicle, or aircraft to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article.
>
> (b) As used in this section, the term "contraband article" means—
>
> > (1) Any narcotic drug . . . which has been acquired or is possessed, sold, transferred, or offered for sale, in violation of any law so the United States dealing therewith; . . ..

Section 782 provides the seizure and forfeiture authority relative to the violation of Section 781, and states:

> Any vessel, vehicle, or aircraft which has been or is being used in violation of any provision of Section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited . . .

Although forfeiture decisions involving the statutes in question herein are legion, no previous case has confronted the exact factual basis present in the instant proceeding.

Close examination of recent federal decisions involving these statutory provisions indicates an evolving trend toward a new principal: a substantial nexus between the contraband or illegal activity and the inanimate facilitating instrumentality (i. e. vessel or vehicle) must be demonstrated. *United States v. One 1972 Datsun,* 378 F.Supp. 1200 (D.N.H.1974): *United States v. One 1971 Porsche Coupe,* 364 F.Supp. 745, 747–8 (E.D.Pa.1973).[3] Evidence of this trend is particularly demonstrated by three cases in which the contraband involved was not transported or held in the claimants' vehicles, but the instrumentalities for facilitating the illegal activity were peripherally or tangentially involved. *United States v. One 1971 Chevrolet Corvette,* 496 F.2d 210 (5th Cir. 1974); *United States v. One 1974 Cadillac Eldorado,* 407 F.Supp. 1115 (S.D.N.Y.1975), rev. 548 F.2d 421 (2 Cir. 1977); *United States v. One 1972 Datsun, supra.* In all three instances, the courts found the nexus between the utilization of the vehicles and the underlying criminal activity to be too remote, casual, and insubstantial to warrant forfeiture.

■ Meader's description of the bags, the method of their removal through Porthole # 2 of the Ea, the identification of the crewmembers involved, and the direction of the participants' flight from beneath the gangway upon his arrival, all establish to the Court's satisfaction the substantial nexus between the contraband recovered in the adjacent field and water, and the vessel.

The facts in the instant case are not unlike those cases in which individuals are observed throwing packages from their automobiles upon the approach of law enforcement officials. When subsequent searches recovered similar objects in the same general area and laboratory tests revealed the objects to contain contraband, federal courts have not been troubled by the break in chain of custody between the vehicle and the contraband. *United States v. One 1967 Riviera,* 439 F.2d 92 (9th Cir.

1971); *United States v. One 1971 Porsche Coupe, supra.* Although the claimant stresses the failure of the libelant to apprehend a crewmember in possession of a package of cocaine which was observed being removed from the vessel, the Court is of the opinion that both the evidentiary standard of preponderance of the evidence and the nature of the applicable "probable cause" standard dictate a finding against the claimant. Since the applicable standard of review is "reasonable ground for belief in guilt," the Court is of the opinion that the libelant has demonstrated "probable cause" for the seizure of the M/V Ea on June 19, 1976.

## 2. COMMON CARRIER ISSUES

### A. Findings

Between February, 1974 and June, 1976, the M/V Ea made fifty-three voyages with the final northerly destination of Tampa, Florida. An analysis of the outward foreign manifests indicates the Ea carried a variety of goods for several different American and Canadian companies on the southerly leg of the Tampa-Turbo trade. Conversely, the vessel rarely deviated from the carriage of produce (bananas, yams, and plantains) for Parker Banana Company and Turbana Banana Company on the northerly route. Because of the distinct nature of the two routes, and because the alleged violation of the law occurred during and at the termination of a northerly leg of the trade, the common carrier issue will be analyzed in light of the northerly voyages of the Ea and particularly the final voyage.

It is essential at the outset to understand the relationship between the primary parties in the northerly trade. The Ea had been time-chartered on January 18, 1974 by Parker Banana Company from Atlantic Reefers, Inc. of Willemstad, Curacao. The time-charter lists as the intended trade: "bananas Colombia Florida." The charter also inserts the term "banana laden" relative to the consumption of fuel and the

---

**3.** *See also, Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *United States v. U. S. Coin and Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1972).

vessel's speed and requires that the vessel be "in every way fitted for the banana service." Although Parker Banana Company had time-chartered the entire reach of the Ea, Parker had then contracted with Turbana Banana Company to permit Turbana to use at least half of the vessel for its needs. On several occasions Parker did not participate in the importation of produce, and Turbana was responsible for the entire shipment aboard. The libelant introduced into evidence an invoice from Parker to Turbana which was styled "Pooling of Chartership, M/V Ea, May 11, 1976." The invoice indicated that Turbana was responsible to Parker for half the cost of the Ea during the period May 21, 1976 to June 21, 1976. Also of interest is the fact that the primary shipper of produce on board the Ea was Union de Bananeros de Uraba, S.A., a subsidiary of Turbana Banana Company.

Exclusive of the course of conduct evident in the southerly trade, there was no evidence adduced at trial that the charterer solicited, advertised or held itself out as a carrier for all shippers on the northerly voyages from Turbo. Additionally, the claimant never presented evidence relative to any invoice or statement of billing to any of the four shippers who participated in the Ea's northerly trade. Although this would not be expected in relation to the principal shipper, Union de Bananeros de Uraba, since Turbana, its parent company, was assisting Parker in the payment of the cost of the Ea, it is significant that no evidence of bills to or payments from the "independent" shippers was produced. The claimant also failed to show that the carrier had considered filing or had filed a tariff with the Federal Maritime Commission, a requirement for the common carriage of goods at sea. Finally, there was no definitive evidence that the charterer did undertake to carry for hire or did carry for hire under bills of lading *all* cargoes tendered it in the northerly trade.

4. *See* Appendix.

5. *See* Appendix for January 8, 1975 and January 20, 1976 voyages. "Independent" used in

A review of the official Inward Foreign Manifests shows fifty-three northerly voyages to Tampa, fifty-one from Turbo, Colombia and two from Puerto Bolivar, Ecuador.[4] On forty-five of the voyages Union de Bananeros de Uraba was the sole shipper, on six voyages Union was a joint shipper, and on only two occasions, the two trips from Ecuador, was Union not a shipper. On the consignee side, Parker and Turbana were the sole consignees on forty voyages, Parker and Turbana joined with one other consignee on five occasions, Turbana was the sole consignee on three occasions, and Turbana joined with one other consignee on two occasions. On the two trips from Ecuador there was no consignee listed, and there is a dispute as to the consignee on the June 24, 1975 arrival date. On the cargo side, forty-eight of the northerly voyages carried only produce, and the five remaining voyages carried produce and one other type of cargo. Further examination reveals only two occasions on which there was an entirely independent entity involved in a shipment aboard the Ea.[5]

Substantial dispute surrounds the Ea's cargo, shippers, and consignees on the final voyage. The official Inward Foreign Manifest indicates that Parker and Turbana were the joint and sole consignees and Union de Bananeros was the sole shipper. The unofficial manifest, which was not signed by the captain, indicates that Union de Bananeros was the sole shipper with Turbana and Banana Supply Company as consignees. The bills of lading are consistent with the unofficial manifest, but also include a shipment of bananas with Compania Frutera de Sevilla as the shipper and Chiquita International Trading Company as the consignee. The marked disparity between the three types of cargo records attests to basic unreliability of the documentation for the final voyage.

B. Law

All three of the statutes in question provide an exemption or require a more strin-

this context means unrelated to Parker, Turbana, and Union.

gent standard of proof prior to forfeiture if the vehicle, vessel, or aircraft involved in the illegal activity was a "common carrier." *See* 19 U.S.C. § 1594, 21 U.S.C. § 881, and 49 U.S.C. § 782. The common carrier provisions of each of the three statutes typically appear in the following form:

> Provided, That no vessel, vehicle, or aircraft used by any person as a common carrier in the transaction of business as such common carrier shall be forfeited under the provisions of this chapter unless it shall appear that (1) in the case of a railway car or engine, the owner, or (2) in the case of any such vessel, vehicle, or aircraft, the owner or the master of such vessel or the owner or conductor, driver, pilot, or other person in charge of such vehicle or aircraft was at the time of the alleged illegal act a consenting party or privy thereto . . . 49 U.S.C. § 782.

Definitions of common carriage appear in numerous and disparate bodies of the law. Common carriage is applicable in FELA claims, in ICC proceedings, and in anti-trust cases. In fact, the definitions of common carriage even in the admiralty area are quite varied. A review of the admiralty definitions indicates its use often arises in the context of cargo damage or loss claims, relative to the Carriage of Goods by Sea Act, voyage charters, or the attempted avoidance of the common carrier status to negate the assessment of a penalty for not having filed a tariff with the Federal Maritime Commission.[6]

The common carriage exemption in the three statutes in question increases the government's burden of proof prior to forfeiture by mandating actual consent or knowledge of the illegal activity by a prin-

cipal party. The libelant argues the exemption for a common carrier was designed to provide relief from forfeiture to those owners or masters who engaged in the business of transporting either large numbers of people or a multitude of different goods for numerous shippers or consignees. In *United States v. One 1957 Oldsmobile Automobile,* 256 F.2d 931 (5th Cir. 1958), the Fifth Circuit Court of Appeals rejected a constitutional challenge to one of the forfeiture statutes in question in the instant case and articulated the rationale for the common carrier exemption. The appellee-defendants, having prevailed before the district court, challenged the forfeiture statute on the ground that it unfairly discriminated between private and common carriers. The Court rejected the appellees' argument finding the classification to be a reasonable one. Addressing the rationale for the classification, the court stated:

> The opportunity of the owner of a common carrier to detect or prevent carriage by one of its passengers (who must be carried without discrimination) of a small quantity of narcotics is obviously slight as compared with the opportunity of the owner of an automobile who reserves the full right of inviting to ride whom he wishes. This is one sufficient basis for such classification. There are others that readily come to mind. *Id.* at 933.

Thus the rationale for the common carrier exemption revolves around nature and character of the carriage engaged in by the owner or master and the duties and responsibilities the law implies therein.

■ Although the Court is convinced the common carrier usage with regard to these

6. *Washington ex rel. Stimson Lumber Company v. Kuykendall,* 275 U.S. 207, 48 S.Ct. 41, 72 L.Ed. 241 (1927); *Pendleton v. Benner Line,* 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770 (1918); *The Propeller Niagra v. Cordes,* 62 U.S. 7 (21 How.) 16 L.Ed. 41 (1958); *Nichimen Company v. M. V. Farland,* 462 F.2d 319 (2d Cir. 1972); *United States v. Stephen Brothers Line,* 384 F.2d 118 (5th Cir. 1967); *The Oakley C. Curtis,* 4 F.2d 979 (2d Cir. 1924); *The Fri,* 154 F. 333 (2d Cir. 1907); *Travelers Indemnity Company v. SS Polarland,* 418 F.Supp. 985 (S.D.N.Y. 1976); *Gerber v. SS Sabine Howaldt,* 310 F.Supp. 343 (S.D.N.Y.1969); *Pacific Vegetable Oil Company v. M/S Norse Commander,* 264 F.Supp. 625 (S.D.Tex.1966); *Koppers Connecticut Coke Co. v. James McWilliams Blue Line, Inc.,* 18 F.Supp. 992 (E.D.N.Y.1936); *The City of Dunkirk,* 10 F.2d 609 (S.D.N.Y.1925); *The Ella Pierce Thurlow,* 300 F. 103 (S.D.N.Y.1921); *The Cape Charles,* 198 F.Supp. 346 (E.D.N.C. 1912); *The Rokeby,* 202 F. 322 (S.D.N.Y.1911); *Non-Vessel Carriers, etc.,* 1961 AMC 1024 (1961); *Piazza Company v. West Coast Line,* 1951 AMC 1668 (1951).

three statutes is *sui generis,* numerous decisions which interpret the criteria relevant to common carrier status are tangentially relevant. The initial determination of whether a vessel is a common carrier depends upon the nature and character of the trade engaged in by the owner. Judge Brown in *United States v. Stephen Brothers Line,* 384 F.2d 118 (5th Cir. 1967) identified several of the characteristics commonly associated with common carriers:

> The salient characteristic of a common carrier is that "He must be engaged in the business of carrying goods for others as a public employment, and must hold himself out as ready to engage in the transportation of goods for persons generally . . . [and] holds himself out as ready to engage in the transportation of goods for hire as a public employment . . . and . . . undertakes for all persons indifferently." *Id.* at 122–3.

Addressing the facts in *Stephen Brothers,* the court stated:

> By any or all standards the carrier's operation of its M/V Zaida was that of a common carrier in foreign commerce. Inward and outward customs manifests reflected hundreds of shipments of a wide variety of cargo running the gamut from automobiles, buses, groceries, gas ranges, freezers, to veils and hat linings. Shipments of this kind had come from active solicitation by the carrier among established freight forwarders whose compensation frequently came from the fees paid by the carrier. *Id.* at 123–4.

The Court in a footnote also found that a carrier need not solicit cargo to be a common carrier, but was sufficient if the carrier "became known generally throughout the trade as planning to transport merchandise, and did transport merchandise of others . . . to the extent of its capacity." *Id.* at 123 n. 14. Finally, the court held that neither regularity nor predetermination

was an essential element of common carriage. *Id.* at 123 n. 15.

Utilizing the criteria enunciated in *Stephen Brothers,* the Court is of the opinion that on the northerly voyages the M/V Ea was not a common carrier. Although the southerly voyages indicate that the Ea became known generally throughout the trade (Tampa to Turbo), this is the only one of the criteria established which positively identifies the Ea as a common carrier. The northerly voyages do not indicate a holding out to carry goods indiscriminately for others external to the interests of Parker and Turbana. In fact, the claimants presented no evidence that the carrier had advertised or solicited for the general carriage of goods on either one of the routes. *Non-Vessel Carriers,* 1961 AMC 1024, 1034–5 (FMB. 1961). Further, the carrier did not assume a legal duty to carry for all equally. *Cape Charles,* 198 F. 346 (E.D.N.C.1912). Also significant to the Court is the failure of the claimant to present evidence as to the "for hire for public employment" requirements set forth in *Stephen Brothers.* The claimant did not proffer or introduce any invoices or bills which would indicate that any shipper or consignee was charged for the carriage of goods aboard the Ea.[7]

There is a line of decisions which premise a finding of common carrier status on whether the carrier transported cargo for two or more shippers. *Gerber v. SS Sabine Howaldt,* 310 F.Supp. 343, 350 (S.D.N.Y. 1969); *Ella Pierce Thurlow,* 300 F. 103, 105 (S.D.N.Y.1921). Although such a rigid rule in the common carrier-forfeiture area is in the Court's opinion suspect, it is interesting to analyze the facts of this case relative to the two shipper standard.[8] On eight of the Ea's northerly voyages there were two shippers involved.[9] On seven of those eight occasions, Union de Bananeros de Uraba was one of the shippers. On the other two shipper voyage, the Ea's captain was listed

---

**7.** The primary exception to this was the invoice which the libelant introduced relative to the "Pooling of the Chartership for the M/V Ea." *See* Government's exhibit 10.

**8.** *See* Appendix.

**9.** Voyages Nos. 21, 36, 38, 39, 42, 45, 46, and 53.

as one of the shippers.[10] Given the relationship of Union to Turbana and Turbana to Parker and the joint participation of the latter two in the charter party, it is doubtful whether Union should be considered an independent shipper for purposes of the two shipper rule. It is also interesting to note that the Ea never carried goods on the same northerly voyage for two consignees independent of Parker and Turbana with the exception of the last voyage, and the reliability of the documentation on that voyage is in serious question. Given the dearth of shippers and consignees independent of Parker, Turbana, and Union de Bananeros de Uraba, the Court is of the opinion the *Ella Pierce Thurlow* standard has not been met. Indeed, the *Stephen Brothers'* facts of "hundreds of shipments of a wide variety of cargo" has not been approached by the Ea's northerly voyages.

Finally of significance to the Court is the failure of the carrier to file a schedule of rates or tariffs with the Federal Maritime Commission as required of every "common carrier by water in interstate commerce." 46 U.S.C. § 817. Although the failure to file the tariff does not preclude the Court from finding that the vessel was a common carrier, it does indicate that the charterer did not intend to be within the ambit of the statute.

■ Thus the Court is convinced that the defendants have failed to prove by the preponderance of the evidence the Ea's status as a common carrier on the northerly voyages. The nature of the Ea's carriage on the southerly route, taken in isolation, would indicate a holding out sufficient to show common carrier status. Conversely, the nature of the Ea's northerly voyages indicates private carriage for Parker and Turbana and does not illustrate in the least an obligation or duty to carry for all parties indiscriminately. Since the forfeiture in question involved the Ea on the northerly route and because the nature of the trade was distinct on the two routes, the Court is of the opinion the Ea was not a common

carrier for purposes of the issues presented in the instant case.

### 3. INVOLVEMENT OF THE MASTER OR OWNER

Since the Court has decided there was reasonable ground for belief in guilt and the M/V Ea was not a common carrier, further findings of facts and conclusions of law would in the ordinary situation be unnecessary. However, in light of the novelty of the common carrier issue in the forfeiture context and the possibility of a defense premised on the reasonable efforts of the owner or master to prevent the proscribed use of the vessel, the Court is of the opinion further findings are necessary. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 417 U.S. 663, 689–90, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

### A. Reasonable Efforts to Detect Smuggling

#### (1) Findings of Fact

The claimant endeavored at trial to present a defense premised on the efforts of the master and the operating company to ferret out smuggling on board the vessel. The evidence at trial indicated that the claimant posted notices in all languages regarding the illegality of smuggling, maintained a black list which prohibited the hiring of any seaman who had previously been identified as a smuggler, and on occasion rotated the crewmembers. In addition, there was testimony that the vessel was searched prior to departure from Turbo, although this was because of the fear that beetles had infested the cargo of produce.

#### (2) Law

■ In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) the Supreme Court reviewed the statutory and historical basis for forfeiture actions and created a defense premised on the reasonable efforts of the master or owner of a vessel to prevent its

10. Voyage 46.

illegal use.[11] The Supreme Court did not delineate with specificity the dimensions of "reasonable efforts" to prevent smuggling. Although the Court is without specific guidance, it is of the opinion the modest efforts of the claimants in this case fall short of the standard.

The M/V Ea was engaged in a trade which took the vessel into a remote and isolated section of a country which is well known for drug related activities. The Ea while engaged in this trade had on two previous occasions been assessed penalties for drug-related activities. Considering these two factors, the Court is of the opinion a much higher standard of investigation was required by the master of the vessel on its final voyage. The precautions taken by Captain Gernler, a previous master of the Ea, indicate a methodology which was more appropriately attuned to the circumstances. Unannounced thorough searches of the crew's living quarters, the removal of wall and ceiling panels, opening and inspection of vents, and increased officers' patrol while the vessel was in the Gulf of Uraba are all practices which were necessary and essential. Indeed, a search for beetle infestation might reveal or detect hidden packages of cocaine; yet the former search is not a substitute for the type of investigation necessary to surprise smugglers. The claimant's overall plan for handling the problem was seemingly comprehensive and on paper it might be appealing to a shipping company, but it was not adjusted to the realities of the situation present in the Turbo to Tampa trade. The Court finds the precautions taken to prevent the illegal use of the vessel were inadequate.

### B. "Consenting Party or Privy Thereto"

#### (1) Findings of Fact

The boatswain on the Ea's final trip from Turbo was Ivan Felita, a native of Curacao in the Dutch Antilles. Felita had been a crewmember on the Ea since October, 1975 and had previously served under Captain Maarleveld, the Ea's final commander. Felita, who spoke Dutch, Spanish, and English on a vessel whose officers were Dutch and whose crew was substantially Colombian, served as a liaison between the officers and crew and was responsible for the crew's work assignments. Prior to the Ea's departure from the Gulf of Uraba and during the voyage to Tampa, Felita had seen several crewmembers, Ortega Ospina and Sarco Laurido, whose cabin was next to his, handling large packages, the contents of which Felita identified as cocaine. The boatswain testified he contacted one of the officers, the second mate, Arie Zym, and told him that cocaine was on board the vessel. Felita also testified he had seen Captain Maarleveld standing in the doorway of Ortega Ospina and Sarco Laurido's cabin when numerous packages of cocaine were strewn about their room. Captain Maarleveld denied any participation in the illegal activity and further denied any knowledge of the cocaine's presence on board the Ea. Second mate Zym also denied knowledge of cocaine on board and denied any conversation with Felita prior to the search of the vessel by the Customs Service on June 17, 1977. Firstmate Albertus Trenning testified he knew nothing about the presence of cocaine aboard the Ea and never discussed the matter with Felita. The depositions of the crew which were taken on July 1, 1976 are part of the evidence. All the crewmembers denied participation in the illegal activity and also denied any knowledge of cocaine on board the vessel.

The claimants attacked Felita's testimony on the basis of his grand jury testimony in November, 1976 and his deposition in June, 1976. On both occasions Felita denied any knowledge of the presence of cocaine on board the Ea. On the stand Felita admitted he had lied on the previous occasions and explained that his statements were false, at least in reference to the deposition, because of the explicit threats made upon

11. Thus, if the owner or master of a private carrier was an innocent party and had taken all reasonable precautions to prevent the illegal use of the conveyance, the Supreme Court would not permit the forfeiture of the conveyance.

his life by several crewmembers.[12] Evaluating the testimony of the captain, officers, and crew, which amount to absolute denials, in light of Felita's testimony, and all the other evidence, circumstantial and otherwise, the Court is of the opinion Boatswain Felita is to be believed. The Court further specifically finds that Captain Maarleveld knew of the presence of the cocaine on board the Ea.

### (2) Law

All three statutes in question contain language which prohibit the forfeiture of a common carrier "unless it shall appear that the owner or master of such vessel or the conductor, driver, or other person in charge of such vessel was at the time of the alleged illegal act a consenting party or privy thereto." 19 U.S.C. § 1594. *See also,* 49 U.S.C. § 782 and 21 U.S.C. § 881(a)(4)(A). A review of the three statutes indicates that the terms "consenting party and privy thereto" have not been judicially interpreted. A common sense definition of the two terms would have to take into consideration the fact that in the private carrier context the innocence of the owner is not a defense unless the principal parties have taken all reasonable precautions to prevent the illegal use of the vessel. *Calero-Toledo v. Pearson Yacht Leasing Co., supra* 416 U.S. at 683–690, 94 S.Ct. 2080. Because Congress has provided a special burden or standard of proof for the forfeiture of a common carrier, the Court is of the opinion that innocence of owner or master is a defense in the common carrier context. For that reason, the Court is convinced that the law does not require the intimate participation of the owner or master in the illegal activity for them to be within the "consenting party or privy thereto" exception, but merely the knowledge of the existence of the activity and acquiescence in its continued operation of one or the other. Although "consenting" implies an active approval, as-

sent, or agreement, "privy" implies mere awareness or familiarity in a secret or covert fashion.

Felita's testimony places Captain Maarleveld, the master of the M/V Ea in the doorway of the room in which the cocaine was stored at a time when it was in plain view. The Court is thus convinced that the Master, Captain Maarleveld, was a consenting party and privy to the illegal activity taking place aboard the M/V Ea on the final voyage.

### CONCLUSION

Upon consideration of the evidence adduced at trial and the memoranda of the parties, the Court is of the opinion there was reasonable cause to believe in the guilt of the M/V Ea in the illegal activity. Guilt in this sense is that the vessel was used to facilitate the importation of cocaine, a controlled substance, in violation of 19 U.S.C. § 1594, 21 U.S.C. § 881, and 49 U.S.C. § 781. Probable cause having been established, the Court is convinced that the seizure effected on June 19, 1976 was proper. In light of the failure of the claimant to prove the M/V Ea was a common carrier, the libelant was not required to but did prove both the involvement of the master in the illegal activity and the failure of the master to implement reasonable precautions to prevent the illegal use of the vessel. The libelant having prevailed on all issues, the Court is of the opinion the M/V Ea should be forfeited. Accordingly, it is

ORDERED:

1. That the M/V Ea is hereby forfeited to the libelant, United States of America, subject to the claim of Banque Francaise Du Commerce Exterieur.

2. That case No. 77–178 Civ. T–K, Ea's damage claim, is hereby DISMISSED.

3. That the Clerk is directed to enter judgment and tax costs accordingly.

---

12. The claimant also attempted to impeach Felita on the basis of his guilty plea to the charge of possession of cocaine with intent to deliver. See defendant's exhibit 45. Since the plea was unrelated to the activities of the Ea, the Court does not consider this conviction to be of great weight or dispositive on the issue of Felita's veracity.

# APPENDIX

## EA'S NORTHERN VOYAGES [1]

| VOYAGE # | ARRIVAL DATE IN TAMPA | SAILING FROM | CARGO | CONSIGNEE | SHIPPER |
|---|---|---|---|---|---|
| 1. | February 3, 1974 | Turbo | P | Pa/T | U |
| 2. | March 5, 1974 | Turbo | P | Pa/T | U |
| 3. | March 19, 1974 | Turbo | P | Pa/T | U |
| 4. | April 2, 1974 | Turbo | P | Pa/T | U |
| 5. | April 30, 1974 | Turbo | P | Pa/T | U |
| 6. | May 14, 1974 | Turbo | P | Pa/T | U |
| 7. | May 29, 1974 | Turbo | P | Pa/T | U |
| 8. | June 11, 1974 | Turbo | P | Pa/T | U |
| 9. | June 25, 1974 | Turbo | P | Pa/T | U |
| 10. | July 8, 1974 | Turbo | P | Pa/T | U |
| 11. | July 22, 1974 | Turbo | P | Pa/T | U |
| 12. | August 8, 1974 | Turbo | P | Pa/T | U |
| 13. | August 20, 1974 | Turbo | P | Pa/T | U |
| 14. | September 3, 1974 | Turbo | P | Pa/T | U |
| | | Turbo | Un | CP | U |
| 15. | September 17, 1974 | Turbo | P | Pa/T | U |
| 16. | October 1, 1974 | Turbo | P | Pa/T | U |
| 17. | October 29, 1974 | Turbo | P | Pa/T | U |
| 18. | November 12, 1974 | Turbo | P | Pa/T | U |
| 19. | November 29, 1974 | Turbo | P | Pa/T | U |
| 20. | December 26, 1974 | Turbo | P | Pa/T | U |
| 21. | January 8, 1975 | Turbo | P | Pa/T | U |
| | | Turbo | MP | IS | FT |
| 22. | January 21, 1975 | Turbo | P | Pa/T | U |
| 23. | February 3, 1975 | Turbo | P | Pa/T | U |
| 24. | February 18, 1975 | Turbo | P | Pa/T | U |
| 25. | March 4, 1975 | Turbo | P | Pa/T | U |
| 26. | March 18, 1975 | Turbo | P | Pa/T | U |
| 27. | March 31, 1975 | Turbo | P | Pa/T | U |

1. The information contained in the appendix was extracted from the Ea's Inward Foreign Manifests unless otherwise noted. All the manifests were signed under oath by the Ea's captains.

| VOYAGE # | ARRIVAL DATE IN TAMPA | SAILING FROM | CARGO | CONSIGNEE | SHIPPER |
|---|---|---|---|---|---|
| 28. | April 15, 1975 | Turbo | P | Pa/T | U |
| 29. | April 29, 1975 | Turbo | P | Pa/T | U |
| 30. | May 12, 1975 | Turbo | P | Pa/T | U |
| 31. | May 26, 1975 | Turbo | P | Pa/T | U |
| 32. | June 10, 1975 | Turbo | P | Pa/T | U |
| 33. | June 24, 1975 | Turbo | P | NCB[2] | U |
| 34. | July 7, 1975 | Turbo | P | T | U |
| 35. | July 22, 1975 | Turbo | P | T | U |
| 36. | August 5, 1975 | Turbo | P | Pa/T | U |
| | | | P | T | CFS |
| | | | Wa | CP | U |
| 37. | August 19, 1975 | Turbo | P | Pa/T | U |
| 38. | September 2, 1975 | Turbo | P | T | U |
| | | | P | T | CFS |
| | | | Wb | CP | ?[3] |
| 39. | September 16, 1975 | Turbo | P | Pa/T | U |
| | | | P | T | CFS |
| 40. | September 30, 1975 | Turbo | P | Pa/T | U |
| 41. | January 6, 1975 | Turbo | P | Pa | U |
| | | | P | T | U |
| 42. | January 20, 1976 | Turbo | P | Pa | U |
| | | | P | T | U |
| | | | P | CH | CFS |
| 43. | February 4, 1976 | Turbo | P | Pa | U |
| | | | P | T | U |
| 44. | February 17, 1976 | Turbo | P | Pa | u |
| | | | P | T | U |
| 45. | March 2, 1976 | Turbo | P | T | U |
| | | | P | T | CFS |

2. Although the official manifest lists the National City Bank of Miami as the consignee, all the bills of lading on that voyage indicate Turbana Banana Company was the consignee.

3. The official manifest did not list a shipper for the goods being sent to Carlos Perez, but in the two previous instances in which Carlos Perez was the consignee, the shipper was Union de Bananeros de Uraba, S.A.

| VOYAGE # | ARRIVAL DATE IN TAMPA | SAILING FROM | CARGO | CONSIGNEE | SHIPPER |
|---|---|---|---|---|---|
| 46. | March 19, 1976[4] | Puerto Bolivar, Ecuador | P<br>WH | O<br>Pa | EBN<br>M |
| 47. | March 30, 1976 | Turbo | P<br><br>P | Pa<br><br>T | U<br><br>U |
| 48. | April 13, 1976 | Turbo | P | Pa/T/Bs | U |
| 49. | April 24, 1976 | Turbo | P | Pa/T | U |
| 50. | May 4, 1976 | Turbo | P | Pa/T | U |
| 51. | May 18, 1976 | Turbo | P | Pa/T | U |
| 52. | June 3, 1976[4] | Puerto Bolivar, Ecuador | P | O | EBN |
| 53. | June 15, 1976[5] | Turbo | P<br>P<br>P | T/Pa<br>CHI<br>Bs | U<br>CFS<br>U |

4. It is interesting to note that although the Ea carried a variety of goods on the southerly leg from Tampa to Turbo, on the two occasions the vessel traveled to Ecuador, it carried no goods whatsoever on the southerly leg.

5. See footnote 5 and the accompanying text for an explanation of the documentation of this voyage.

Symbols

1. Bs Banana Supply Company

2. CFS Compania Frutera de Sevilla

3. CH Chiquita Brand Inc.

4. CHI Chiquita International Trading Co.

5. CP Carlos Perez

6. EBN Exportadore Bananera Noboa, S.A.

7. FT Fundiciones Technica, S.A. Medellin, Colombia

8. IS Industrial Supply Co., Miami, Florida

9. M Captain B. J. Maarleveld

10. MP Machinery Parts

11. NCB National City Bank of Miami, Florida

12. O Order (unnamed consignee)

13. P Produce (bananas, yams, plantains)

14. Pa Parker Banana Company

15. T Turbana Banana Company

16. U Union de Bananeros de Uraba, S.A.

17. Un Uniforms (one box)

18. Wa 200 Fence Posts and 6 Chairs

19. Wb 9 Doors

20. WH 70 Bottles Scotch

